MAYFLOWER SEAFOODS, INC. *vs*. INTEGRITY CREDIT
CORPORATION.

No. 86-1301.

Plymouth. November 17, 1987. — March 7, 1988.

Present: KASS, CUTTER, & ARMSTRONG, JJ.

*Contract,* Equipment lease. *Agency,* Scope of authority or employment.
*Practice, Civil,* Directed verdict, Judgment notwithstanding verdict.

Conspicuous language in a commercial equipment leasing agreement, ex-
pressly stating that the finance lessor which had arranged to purchase
the equipment for the purpose of leasing it to the lessee made no represen-
tations or warranties with respect to the equipment, was binding on the
lessee, with the result that the lessor was not liable for the inadequate
performance of the equipment and the lessee was bound to make lease
payments according to the terms of the agreement. [457-459]
At the trial of an action for breach of a commercial equipment leasing agree-
ment, there was not sufficient evidence to warrant submission to the
jury of the issue whether a third party had apparent authority to bind
the finance lessor by his representations about the equipment. [459-461]
The judge at the trial of a civil action properly submitted the common law
issues to the jury and thereafter allowed the defendant's motion for
judgment notwithstanding the verdict, and the judge properly reserved
the nonjury claims for his own determination. [461-462]
Counsel for the defendant in a civil action by his objections to the denial of
his motion for a directed verdict adequately raised his objection to the
submission of any issue to the jury. [462]

CIVIL ACTION commenced in the Superior Court Department
on July 10, 1985.

The case was tried before *Guy Volterra,* J.

*Louis J. Scerra, Jr.* (*Gary R. Greenberg* with him) for the
plaintiff.

*Isaac H. Peres* for the defendant.

CUTTER, J. Mayflower Seafoods, Inc. (Mayflower), con-
ducts a restaurant and seafood business in Plymouth. Energy

Control Systems, Inc. (the vendor[1]), was engaged in selling devices and systems of energy control. Integrity Credit Corporation (the corporate lessor) was formerly known as Tri-Continental Leasing Corporation. The trial judge found that the corporate lessor is a "finance lessor, whose service is to provide funds to persons or entities" to enable them to lease equipment. In the spring of 1983, Robert Harrison, a salesman employed by the vendor but allowed by the vendor also to work for others, approached John Howland, an officer of Mayflower, and made an inspection of that company's facilities. Harrison represented to Howland at various conferences that a Solidyne energy controller or computer device (of a type sold or distributed by the vendor) would reduce Mayflower's energy consumption by about ten percent.

Mayflower, by a preliminary agreement, dated May 16, 1983, agreed to lease the Solidyne equipment recommended by Harrison, rather than to buy it. Harrison, on June 29, 1983, using a blank form (see note 6, *infra*, and related text) of a type supplied to the vendor by the corporate lessor, had Mayflower execute a lease (not signed by the lessor) of the Solidyne equipment which later was accepted by the corporate lessor. The corporate lessor then purchased the equipment from the vendor for $16,800 and leased it to Mayflower for a monthly rental of $640.29.[2]

After the initial transactions, the corporate lessor sent to Mayflower a schedule of payments to become due under the lease. Mayflower made thirteen monthly payments under the lease including a last payment on August 6, 1984.

---

[1] The vendor was originally named as a defendant in the complaint which initiated the present litigation. The vendor was defaulted on July 9, 1986. From the evidence at trial, it was possible for the trial judge to assess damages against the defaulted vendor. See general discussion in *Kenney* v. *Rust*, 17 Mass. App. Ct. 699, 704-706 (1984). Judgment was entered for Mayflower against the vendor for a substantial amount. No appeal by the vendor is before us.

[2] Mayflower paid to the vendor two months' rent in advance, which Harrison computed through the use of tables supplied to the vendor by the lessor. The vendor then sent a bill to the lessor for $16,800 for the equipment and retained the two months' rent of $1,280.58. The lessor sent on July 6, 1983, a check to the vendor for the balance of $15,519.42.

A few months after using the equipment, Mayflower noticed that the Solidyne equipment was not providing energy savings of the type and amount which met Harrison's representations of a ten percent energy reduction. Mayflower notified Harrison and the vendor of this and tests revealed that the complaint was justified. Efforts made to improve the equipment's performance were not successful. All these transactions took place in the summer and fall of 1983. Mayflower, as already stated, continued to pay to the corporate lessor the rent under the lease due through August 6, 1984.

On October 31, 1984, Mayflower's counsel threatened to bring an action against the corporate lessor for fraud and misrepresentation unless the lessor cancelled the lease, removed the equipment, and stopped attempts to collect from Mayflower the balance due under the lease. To this on November 2, 1984, the corporate lessor (a) by one letter notified Mayflower of its default under the lease and demanded return of the equipment to be sold (the proceeds to be applied on the delinquent account), and (b) by another letter told Mayflower that the payments due under the lease were being accelerated, that the total amount then due was $15,274.12, and that suit would be brought to recover that amount on November 12, 1984, if not then paid.

On July 10, 1985, Mayflower filed in the Superior Court a complaint seeking declaratory relief under G. L. c. 231A. Mayflower sought to recover for breach of contract by the vendor and by the corporate lessor, alleging both of them had committed a breach of contract and had misrepresented negligently the efficiency of the Solidyne equipment leased to Mayflower. Mayflower also sought to recover from both of these then defendants on the ground that they had engaged in unfair and deceptive acts in violation of G. L. c. 93A, §§ 2 and 11.[3]

At the opening of trial, the judge (after defaulting the vendor, see note 1, *supra*) stated for the record and to counsel that he

___

[3] The corporate lessor by its answer disputed certain allegations of fact and asserted various affirmative defenses and a counterclaim to recover the accelerated unpaid rent and other charges. The vendor did not defend the action against it. See note 1, *supra*.

"reserved to" himself the question of assessment of damages against the defaulted vendor, and all claims by Mayflower pursuant to G. L. c. 231A. He also reserved to himself claims by Mayflower against the corporate lessor based on c. 93A. He submitted to the jury the common law claims.

At the close of all the evidence, which occurred when Mayflower rested its case, the judge denied the corporate lessor's motion for a directed verdict. The judge stated to counsel, in the absence of the jury, that he would deny the corporate lessor's motions for directed verdicts and submit to the jury certain issues which he had not reserved to himself in this bifurcated trial.[4] Part of the bifurcated case was then submitted to the jury on ten special questions. These and the answers are summarized in the margin.[5]

The judge, after taking on July 11, 1986, the jury's answers to the special questions, filed on July 17, 1986, consolidated

---

[4] He indicated that he was of opinion "that a rational juror cannot conclude that an agency relationship existed" between the corporate lessor and Harrison. Nevertheless, he felt bound by *Soares* v. *Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 975 (1976), and *Smith* v. *Ariens Co.*, 375 Mass. 620, 627 (1978), to deny a directed verdict and to submit nonreserved issues to the jury so that, if the jury decided in Mayflower's favor issues on which he would have granted the corporate lessor a directed verdict, he could deal with the matter on a motion for judgment n.o.v., thus possibly avoiding the necessity of a second jury trial. The judge made it clear that only the two decisions just cited led him to submit to the jury the common law issue, and he "invited" counsel for the corporate lessor (in the event of an adverse verdict) to submit a motion for judgment notwithstanding the verdict.

[5] The jury answered 1. that the corporate lessor in dealing with Mayflower was a "finance lessor" (and not a "merchant lessor"); 2. that Harrison was an agent of the corporate lessor in the sale; 3. that Harrison made a negligent misrepresentation to Mayflower concerning the leased equipment; 4. that the corporate lessor "or its agent" made negligent misrepresentations of a material fact to induce Mayflower to act, and Mayflower acted justifiably in reliance on the representations, to its economic cost; 5. that Mayflower would be compensated adequately by a payment of $1,500; 6. that the corporate lessor committed no breach of its express contract with Mayflower; 8. that Mayflower committed a breach of its express contract with the corporate lessor; and 9. that the breach or nonperformance of its contract by Mayflower was justified by the negligent misrepresentations or breach by the corporate lessor "or its agent." The answers given to questions 6 and 9 made questions 7 and 10 not applicable.

findings of fact, rulings of law, an order for judgment for the corporate lessor on Mayflower's claims against it under G. L. c. 93A, and a declaration under G. L. c. 231A of the rights of the parties on the claims against the corporate lessor made by Mayflower. He also set out an assessment of damages and order for judgment against the defaulted vendor.

In this consolidated order, the judge originally took the position that the answers of the jury to questions 4 and 5 (that as against the corporate lessor Mayflower would be adequately compensated by a payment of $1,500), provided a basis of an order for judgment for Mayflower in that amount. Counsel for the corporate lessor, however, on July 22, 1986, filed a motion for judgment n.o.v. on the claim against it submitted to the jury, and this motion was allowed. Judgment on the issues submitted to the jury was entered for the corporate lessor on September 22, 1986. The net effect of the judgments affecting the corporate lessor thus was (1) a declaration that the lease was valid (as between Mayflower and the corporate lessor) and Mayflower was not justified in its breach of its obligation to pay the accelerated rent, (2) that the corporate lessor was entitled to recover that rent ($17,976.14) and costs from Mayflower, and (3) the corporate lessor had no liability to Mayflower under c. 93A.

1. The lease, signed by Mayflower and thereafter by the corporate lessor, contained at the top of the first page next to the name of the vendor (in legible capital letters) the statement: "NEITHER VENDOR, NOR ANY SALESMAN OR OTHER AGENT OF VENDOR, IS AN AGENT OF LESSOR. NO SALESMAN OR AGENT OF VENDOR IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THIS LEASE, AND NO REPRESENTATION AS TO EQUIPMENT OR ANY OTHER MATTER BY VENDOR SHALL IN ANYWAY AFFECT LESSEE'S DUTY TO PAY THE RENT AND PERFORM ITS OTHER OBLIGATIONS AS SET FORTH IN THIS LEASE." The second paragraph of the lease describes the intended transaction with precision, viz., "Lessee [Mayflower] requests Lessor to purchase the Equipment from a Vendor (the 'Vendor') and arrange for delivery

to Lessee at Lessee's expense . . . ." Paragraph 3 (still on the front page), headed in capital letters "NO WARRANTIES BY LESSOR," is set out in the margin.[6]

From this two page document (printed on both sides of a letter-size single sheet), Mayflower was put on explicit notice of the corporate lessor's status as a finance lessor and that Harrison, as the vendor's salesman, had no authority to vary any standard term of the lease agreement. John Howland, who acted for Mayflower, testified that he did not understand on May 16, 1983, when he signed a preliminary "lease/purchase agreement" with the vendor (which did not mention the corporate lessor or any finance lessor by name), that "another company" would be involved in the transaction. That preliminary agreement, however, stated in a conspicuous note, "The Specific Terms of the lease *may vary depending upon the Leasing*

---

[6] "3. NO WARRANTIES BY LESSOR. The Lessee represents that *Lessee has selected the Equipment leased hereunder* and Lessee *agrees that the Lessor has made and makes no representations or warranties of any kind* or nature, *directly or indirectly, express or implied,* as to any matter whatsoever, including the suitability of such Equipment, its durability, its fitness for any particular purpose, its merchantability, its condition, and/or its quality, or its treatment for tax purposes, and as between Lessee and Lessor or Lessor's assignee Lessee leases the Equipment 'As-Is'. Lessor and Lessor's assignee shall not be liable to Lessee or others for any loss, damage or expense of any kind or nature caused directly or indirectly by any Equipment leased hereunder however arising, including that arising from Lessor's negligence or the application of the laws of strict liability or the use or maintenance thereof or the failure of operation thereof, or the repairs, service or adjustment thereto, or by any delay or failure of operation thereof, of the repairs, service or adjustment thereto, or by any interruption of service or loss of use thereof or for any loss of business or damage whatsoever and howsoever caused. *No representation or warranty as to the Equipment or any other matter by the Vendor or others shall be binding on the Lessor nor shall the breach of such relieve Lessee of, or in any way affect, any of Lessee's obligations to Lessor as set forth herein.*

"*If the Equipment* is not properly installed, *does not operate as represented or warranted by the Vendor* or is unsatisfactory for any reason, *Lessee shall make any claim* on account thereof *solely against the Vendor and shall nevertheless pay Lessor all rent* payable under this lease. Lessor agrees to assign to Lessee, solely for the purpose of making and prosecuting any such claim, any rights it may have against the Vendor for breach of warranty or representation respecting the Equipment. Notwithstanding any fees that may be paid to Vendor or any agent of Vendor" (emphasis supplied).

*Co.* The Lease Rates are approximate and may be subject to change prior to installation" (emphasis supplied). In June, when he was presented with the new lease agreement, he admitted that he "did not read the whole agreement."

Even if Howland did not read the lease agreement, he signed what was "obviously a legal document without bothering to ascertain" its contents. He, as matter of law, was bound by its terms (in the absence of a clear fiduciary relationship, which does not appear here). See *Markell* v. *Sidney B. Pfeifer Foundation,* 9 Mass. App. Ct. 412, 440 (1980), and cases cited; 3 Corbin, Contracts 607 (1960 & Supp. 1984). Howland, as a person engaged in active business in a substantial matter (involving for his restaurant and seafood business at least a $16,800 investment), should have expected that his conduct would be judged by ordinary business prudence and a reasonable recognition of current lease financing practices. See *Patriot Gen. Life Ins. Co.* v. *CFC Inv. Co.,* 11 Mass. App. Ct. 857, 860-863 (1981); 1 Mechem, Agency § 726 (2d ed. 1914).

2. Mayflower contends that the corporate lessor, by its conduct, had so dealt with Harrison and the vendor as to give them apparent authority to act for it. Analysis of what the corporate lessor did in this transaction reveals no significant action by it in any way inconsistent with its position as a finance lessor under the *Patriot General* case, 11 Mass. App. Ct. at 860-863.

Harrison and the vendor plainly had no actual authority to commit the corporate lessor to the lease signed in June, 1983, or to bind it by representations. The evidence reveals only these circumstances:

(a) Harrison told Howland that the vendor would arrange the lease financing. The note in the preliminary lease agreement of May 16, 1983, essentially an application for financing, should have put Howland on notice that the vendor was not to be the lessor of the Solidyne equipment.

(b) The corporate lessor provided the vendor (with whose customers the corporate lessor did a substantial amount of lease financing) with blank lease forms and a standard lease rate book. This was to facilitate lease transactions, but it could not

reasonably be regarded as indicating any authority in the vendor or its salesman to approve any particular credit risk.[7]

(c) Harrison did not tell Howland whether he was acting for the corporate lessor. His business card did not claim that he was a representative of the corporate lessor. It showed him only as a representative of the vendor and as a salesman of Solidyne equipment. Even if he had claimed to represent the corporate lessor, his claim would not have been competent evidence to bind the latter. See *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass App. Ct. 252, 255-256 (1983); 2 Williston, Contracts § 277A, at 225 (3d ed. 1959). This case did not involve the act of a purported officer or representative of a public body, and Harrison held no office in the private corporate structure of either the vendor or the corporate lessor. Compare *Costonis* v. *Medford Housing Authy.*, 343 Mass. 108, 113-115, 116 (1961).

(d) The vendor's president testified that in 1983 it had arranged lease financing for Solidyne equipment mostly with this one company. That appears to have been because this corporate lessor gave prompt service and payment. Because different finance companies had different rates and different "up front" payment requirements, the vendor would call more than one leasing company and give the customer the best deal it could make.[8]

---

[7] In somewhat analogous circumstances, provision of an application form to a broker by an insurer's general agent has been held to create no apparent authority in the broker to issue an oral insurance binder in behalf of the insurer. See *Sheridan* v. *Massachusetts Fire & Marine Ins. Co.*, 233 Mass. 479, 480-481 (1919).

[8] The possibility that the lease transaction could not be made for a customer with any particular leasing company was the explanation given by the vendor's president for having applications for leasing arrangements made to the vendor without mentioning any (named) leasing company. If one leasing company (after checking a proposed customer's credit) turned down the credit, the application could be presented to another finance lessor without going back to the customer. After a leasing company had approved a particular customer's credit, the customer was required to furnish to the finance lessor a witnessed written statement that the customer had paid the

(e) To the vendor's president's knowledge, never did "any representative from the leasing company . . . go to a customer" of the vendor to "take care of the leasing transaction." If Howland of Mayflower had read the lease and had wanted a change in its provisions, or if he had doubts about the scope of Harrison's authority to speak for anyone but the vendor, he, of course, could have consulted the corporate lessor. He was not obliged to deal only with Harrison. See *Record* v. *Littlefield*, 218 Mass. 483, 485-486 (1914).[9] See also *Vallis* v. *Rimer*, 335 Mass. 528, 531-533 (1957).

The preceding summary shows how little was done by the corporate lessor with the vendor, Harrison, and Mayflower. It essentially amounted only to providing a stack of lease forms and a rate book to the vendor. In the aggregate that does not amount to enough to warrant submission to the jury of any issue of "apparent authority" in Harrison to act in behalf of this corporate lessor. As already stated, the corporate lessor did not permit the vendor or Harrison to participate in passing upon Mayflower as a credit risk. We conclude that the judge acted properly in granting judgment n.o.v. for the corporate lessor on the issues submitted to the jury. We reach this conclusion on the authorities already cited, including *Vallis* v. *Rimer*, 335 Mass. at 532-533, and authorities there cited. See Restatement (Second) of Agency §§ 27, 130 (1958).

3. The trial judge properly bifurcated the trial of this case. He was not bound (even on issues not reserved for his own determination concerning which special questions were put to the jury, see note 5, *supra*) by the jury's answers if there was in any event insufficient evidence to submit those issues to the jury. The judge had made it clear that the only reason he was submitting these matters to the jury was to meet the admonition

advanced rent to the vendor. In this aspect of the transaction the vendor was acting much as an insurance or real estate broker would in trying to arrange insurance or mortgage financing for a customer.

[9] It should be noted, in view of Mayflower's present contentions, that when Mayflower first began to question the performance of the Solidyne equipment, Howland called the vendor and Harrison to deal with the poor performance of the equipment.

of the Supreme Judicial Court in the decisions mentioned in note 4, *supra*.[10]

4. Counsel for the corporate lessor at all stages made it clear that he objected to the submission of any issue to the jury and sought a directed verdict on the issues so submitted. The judge decided the c. 93A issues in the corporate lessor's favor in any event. After the corporate lessor filed its motion for judgment n.o.v. (following up his motion for directed verdicts on the nonreserved issues), the judge granted that motion. Counsel, in the circumstances, was not obliged by further objections to protect a position which he already had made clear by his objections to the denial of his motion for a directed verdict.

*Judgment affirmed.*

---

[10] In view of the judge's grant of judgment n.o.v. in favor of the corporate lessor, we have no occasion to consider various questions with respect to the effect of *Nei* v. *Burley*, 388 Mass. 307, 315 (1983), discussed in *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 577-579 (1986), and *Computer Syss. Engr., Inc.* v. *Qantel Corp.*, 571 F. Supp. 1365, 1373 (D. Mass. 1983), aff'd, 740 F.2d 59 (1st Cir. 1984). See also *Solimene* v. *B. Grauel & Co.*, 399 Mass. 790, 799-801 (1987), and cases cited. Compare *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 91 (1983); *Charles River Constr. Co.* v. *Kirksey*, 20 Mass. App. Ct. 333, 337-341 (1985). For a case where the terms of a lease (the existence of which was not in dispute) had bearing upon the grant of judgment n.o.v. see *Agustynowicz* v. *Bradley, ante* 405, 407-408 (1988).