ROBERT FEDERICO & another[1] *vs.* BROCKTON CREDIT
UNION.

No. 94-P-353.

Plymouth. March 20, 1995. - August 4, 1995.

Present: KASS, SMITH, & GREENBERG, JJ.

*Federal Deposit Insurance Corporation. National Credit Union Adminis-
tration. Credit Union. Bank. Mortgage,* Federal insurance.

Discussion of the doctrine developed in *D'Oench Duhme & Co.* v. *Federal
Deposit Ins. Corp.,* 315 U.S. 447, 459-466 (1942) and later codified in
12 U.S.C. § 1823 (e) (1) and 12 U.S.C. § 1787 (p) (2). [57-59]
A bank commitment letter for a residential mortgage was not a sufficiently
contemporaneous document within the meaning of 12 U.S.C. § 1787
(p) (2), so that, as against an assignee of the Federal Deposit Insurance
Corporation, it might be considered evidence that the interest rate set
forth in a mortgage note, executed some thirteen months later and
which did not reference the commitment letter, was misstated. [61-64]

CIVIL ACTION commenced in the Superior Court Depart-
ment on July 9, 1993.

The case was heard by *John J. O'Brien,* J., on a motion to
dismiss.

*John P. Zelonis* for the plaintiffs.
*Thomas Paul Gorman* for the defendant.

KASS, J. Under the doctrine developed in *D'Oench Duhme
& Co.* v. *Federal Deposit Ins. Corp.,* 315 U.S. 447, 459-462
(1942), later codified in 12 U.S.C. § 1823(e)(1) (1994), an
agreement between a bank and a borrower does not bind the
Federal Deposit Insurance Corporation (FDIC) or its assign-
ees unless: (1) the agreement is in writing; (2) was executed
by the bank and the borrower contemporaneously with the
note that is evidence of the borrower's debt; (3) the agree-

[1]Patricia Federico.

ment was approved by the board of directors of the bank; and (4) it has continuously been part of the official bank records.[2] See *Federal Sav. & Loan Ins. Corp.* v. *Griffin,* 935 F.2d 691, 698 (5th Cir. 1991), cert. denied, 502 U.S. 1092 (1992); *Fleet Bank* v. *Steeves,* 785 F. Supp. 209, 213 (D. Me. 1992); *Fleet Bank* v. *Prawer,* 789 F. Supp. 451, 454-455 (D. Me. 1992). The same codification of the *D'Oench, Duhme* principles applies to National Credit Union Administration Board liquidations of credit unions. See 12 U.S.C. § 1787 (p) (2) (1994). The question in the instant case is whether a bank commitment letter for a residential mortgage loan was a sufficiently contemporaneous and official bank document so that it may be considered as evidence that the interest rate set forth in a mortgage note was misstated. A Superior Court judge allowed the Brockton Credit Union's motion to dismiss the plaintiffs' complaint[3] under Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974),[4] and the Federicos have appealed. We affirm.

---

[2]The text of 12 U.S.C. § 1823(e)(1) is: "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement (A) is in writing, (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (D) has been, continuously, from the time of its execution, an official record of the depository institution." For all practical purposes, the language of 12 U.S.C. § 1787 (p) (2) (1994) is identical. See *Savoy* v. *White,* 788 F. Supp. 69, 71-72 (D. Mass. 1992).

[3]Curiously, the complaint does not ask for what one would have thought was the most obvious relief, reformation. Rather it asks for: a declaratory judgment (count I); rescission on the basis of absence of mutuality of agreement, mutual mistake or fraud (count II); and damages under G. L. c. 93A (count III).

[4]The complaint was verified and affidavits were attached to it. The parties and the Superior Court judge have treated the case as a dismissal under rule 12(b)(6) and we so regard it, even though the defendant offered some affidavits in support of its motion to dismiss, i.e., the motion began to take on the accoutrements of one for summary judgment under Mass.R.Civ.P. 56, 365 Mass. 824 (1974).

What underlies the statute and case law (for convenience we shall refer to them collectively as the *D'Oench, Duhme* doctrine) is the idea that government insurers of banks such as the FDIC and purchasers of assets from them, in assessing the assets of failing banks, must in the public interest be able to rely on the primary documents that govern the loan transaction — e.g., notes, mortgages, construction loan agreements — and ought not to be bound by off-record collateral agreements, written or unwritten, that depreciate the value of those assets. See *Langley* v. *Federal Deposit Ins. Corp.*, 484 U.S. 86, 91-92 (1987); *Federal Deposit Ins. Corp.* v. *P.L.M. Intl., Inc.*, 834 F.2d 248, 252 (1st Cir. 1987). By way of illustration, an undersecured loan may look more valuable because the credit-worthy principal shareholder of the strapped corporate borrower has given his personal guaranty. A side agreement between borrower and lender that the lender would never assert its rights under the guaranty would not be enforceable against the FDIC or its assignees.

We turn to the facts stated in the verified complaint, to which various documentary exhibits were attached. On October 5, 1989, Randolph Credit Union issued to Robert and Patricia Federico a commitment letter to lend them $90,000 at a variable interest rate, to be adjusted annually, at a "rate which will be 3.0 basis points over the One-Year Treasury Note at the time of review."[5] About a month later, on November 8, 1989, the loan closed. The lawyer handling the loan for the credit union prepared, and at the loan closing had the Federicos sign, a note for a fixed interest rate of 10.5% per year, forgetting to include any language about va-

---

[5]The specifications regarding the rate of interest provided further that "in no event for an initial period of one year will any increase or decrease for a particular year be greater than two percent (2%) of the rate you are then paying. Furthermore, the interest rate during the life of the mortgage shall not vary more than five percent (5%) from the initial contract rate. Any change in the interest rate will be reflected by a change in your monthly payment. Adjustments will not occur unless the One-Year Treasury Note plus 3.0 bases [*sic*] points exceeds the mortgage rate you are then paying by ¾ of 1 (.75%) percent."

rying the interest rate in subsequent years.[6] In mop up work after the closing, bank counsel noticed the mistake and told the Federicos that they would receive a superseding note, with the correct interest rate, to be signed on the anniversary of the loan, the date on which the interest rate would begin to vary if the prescribed index so dictated.

The superseding note proffered to the Federicos, which they signed — the record does not set out the precise date[7] — in November, 1990, was wrong again. Although it provided for a variable interest rate, rather than tying it to a treasury rate as provided in the commitment letter, the adjustment formula was on the basis of "contract interest rate, purchase of previously occupied homes, national average for all major types of lenders published by the Federal Home Loan Bank Board in the First District fact sheet." When questioned at the time of the signing of the second note, the credit union's counsel told the borrowers that the adjustment rate in the note would produce the same result as the commitment letter formula. That was a remarkable response as the note form used this time (Bankers Group Purchasing Form 706) contained an alternative adjustment formula (the choice of formula was made by checking a box on the form) based on United States Treasury securities. What the difference is in terms of dollars between the commitment formula and the note formula does not appear in the record but at argument we were assured by the parties that there was one.

Apparently the Federicos noticed the discrepancy between the commitment rate and the superseding note rate in May, 1992, and called the difference to the attention of James Donovan, a vice president of the Randolph Credit Union. Donovan acknowledged the mistake and told the Federicos the note would be corrected on its next anniversary, November, 1992. All those communications were by word-of-mouth.

---

[6]Indeed, the credit union's lawyer used a form described in the bottom margin as "MULTISTATE FIXED RATE NOTE—Single Family—FNMA/FHLMC UNIFORM INSTRUMENT."

[7]The superseding note was dated November 8, 1989, the date of the first note executed by the Federicos.

On July 2, 1992, the Commissioner of Banks declared that the Randolph Credit Union was unsound and unsafe and ordered its liquidation. The National Credit Union Administration became the liquidating agent. That same day, by a purchase and assumption agreement, the National Credit Union Administration sold certain assets, including the Federico loan, to the Brockton Credit Union. To that successor lender the Federicos communicated the problem of the errant interest rate. The Brockton Credit Union stood on its rights under *D'Oench, Duhme* and 12 U.S.C. § 1787 (p) (2) and declined to take any corrective measures. This action followed.

The commitment letter is in writing and thereby meets the first of the criteria of 12 U.S.C. § 1787 (p) (2) or § 1823(e). As complaints are, of course, read indulgently in favor of the pleader when considering a motion to dismiss under rule 12(b)(6), *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), we may regard as susceptible of proof, even though not specifically pleaded, the third and fourth conditions of the statute, namely that the commitment letter was approved by the loan committee — with that approval noted in the minutes of the committee — of the Randolph Credit Union and that the commitment letter remained as part of the official records of the credit union. Squarely raised by the complaint, however, is whether the commitment letter, which was executed by both parties on October 5, 1989, satisfied the second statutory requirement, that the writing which purports to vary the note has been executed contemporaneously with the note. The superseding note was executed thirteen months after the commitment letter.

The word "contemporaneously," in the context of 12 U.S.C. § 1823(e)(1), has been strictly construed, see *Resolution Trust Corp.* v. *Midwest Fed. Sav.*, 36 F.3d 785, 797 (9th Cir. 1993), with one court having gone so far as to write that a commitment letter dated three and eight months before the notes executed on the basis of it necessarily was not a contemporaneous agreement because the parties signed the commitment letter *before* the later notes. *Resolution*

*Trust Corp.* v. *Dubois,* 771 F. Supp. 154, 156 (M.D. La. 1991). That case, as here, involved a commitment to make a variable interest loan and the notes executed were fixed rate. The court invoked the *D'Oench, Duhme* doctrine in favor of the Resolution Trust Corporation, which had acquired the assets of the bank that had made the loan. *Ibid.* See also *Federal Deposit Ins. Corp.* v. *Virginia Crossing Partnership,* 909 F.2d 306, 309-310 (8th Cir. 1990) (earlier written agreement which limits the amount of partners' guarantees not enforceable); *Fleet Bank* v. *Steeves,* 785 F. Supp. at 215 (previously executed construction loan agreement cannot be used as a basis for varying later executed note); *Fleet Bank* v. *Prawer,* 789 F. Supp. at 455-456 & n.7 (later executed notes supersede any inconsistent terms of commitment letters).

Of course commitment letters, since they set forth the business terms of a loan yet to be made, almost invariably precede the documents, such as the note, that are evidence of the loan. If sequence were all that were to it, a commitment letter would never be a contemporaneous document, except for the unlikely, though conceivable circumstance when the commitment letter and loan documents are executed simultaneously. Commitment letters have been determined to be contemporaneous, however, when copies of them are referred in the notes later executed. *Erbafina* v. *Federal Deposit Ins. Corp.,* 855 F. Supp. 9, 12 (D. Mass. 1994).

Incorporation of the earlier document in the note (or other simultaneously executed loan document such as the mortgage which secures the note) places the buyer of a failed bank's asset on alert that there are collateral documents which may have a bearing on the economic value of the borrower's account. In *Steeves,* 785 F. Supp. at 215, and *Prawer,* 789 F. Supp. at 455, the writer (the same judge in both cases) emphasizes that the earlier documents through which the borrower desired to vary the loan documents were neither incorporated in nor referred to by the loan documents. Nothing appears in the loan documents attached to the complaint that would place a bank examiner or a purchaser of bank assets

on notice that the loan terms are other than those set out in the promissory note. Compare *Resolution Trust Corp.* v. *Midwest Fed. Sav. Bank*, 36 F.3d at 797-798, in which the court said that the context of a complex commercial loan transaction had placed the acquirer of bank assets on notice of a nonrecourse provision of the loan commitment which had not been written into notes executed about three months later. In the instant case, there was nothing about the transaction, which was a very ordinary one, or about the documents to alert either the National Credit Union Administration or the Brockton Credit Union that the loan terms were other than what was recited in the Federicos' second note.

*Langley* v. *Federal Deposit Ins. Corp.*, 484 U.S. at 93, and *Savoy* v. *White*, 788 F. Supp. 69, 73 (D. Mass. 1992), posit that the *D'Oench, Duhme* doctrine would be defeated in the rare case when there has been fraud as to the essential nature of the instrument or an essential element of it, a genus of fraud described by the phrase "fraud in the essence" or the more alliterative "fraud in the factum." 2 U.L.A., U.C.C., comment 7 to § 3-305(2)(*c*) (Master ed. 1991). That comment offers as an illustration of fraud in the factum the case of someone tricked into signing a note in the belief that the paper is a receipt.

The significance of a fraud in the factum compared to a fraud in the inducement is that it renders the instrument void and thus the instrument may be defended against even in the hands of a holder in due course. G. L. 106, § 3-305(2)(*c*). *Langley* v. *Federal Deposit Ins. Corp.*, 484 U.S. at 93-94. Restatement (Second) of Contracts § 163 comments *a* and *c* (1981). The misrepresentation must go to the essence of the transaction. Fraud in the factum does not occur: when the essential nature of the document — here that it was a promissory note — has been accurately represented or is understood by the signer; when the signer is capable of reading and understanding the content of the document; and when the element misrepresented does not involve the true nature or contents of the instrument, but concerns a term or factor in the transaction, even an important one, but not going to

the essence. *Langley* v. *Federal Deposit Ins. Corp.*, *supra*, at 94 (misrepresentation of acreage and mineral deposits which induced purchase of land and signing of note may have caused note to be voidable but not void, hence *D'Oench, Duhme* doctrine applies). See also *Savoy* v. *White*, 788 F. Supp. at 73. In the instant case the borrowers, the Federicos, were in no doubt about the essential nature of the document they were signing. They were — taking their complaint as true — misled about how the interest adjuster in the superseding note would operate in dollar terms. They were, however, aware of the deviation from the commitment terms and chose to rely on the comforting oral assurance given to them. That was not fraud in the essence. What dominates is the Congressional choice in favor of the relative certainty of the requirements of 12 U.S.C. § 1787 (p) (2) and 12 U.S.C. § 1823(e)(1). On the basis of that legislative policy, the Federicos may not claim against Brockton Credit Union the interest rate originally set out in the Randolph Credit Union's commitment letter. In view of our decision, we need not consider issues raised by the parties under G. L. c. 140D.

*Judgment affirmed.*