Greco, P.J.
This appeal includes a five-volume record appendix one thousand, four hundred and sixty-seven pages in length; arose from a trial that took place over five days and gave rise to two hundred and eleven requested findings of fact and one hundred and nineteen requested rulings of law; and presents issues not only as to fraud and unilateral mistake, but also as to the unconscionability of a guaranty provision, the acceptance of a lessee’s surrender of commercial premises, mitigation of damages, the enforcement of a liquidated damages clause, and the interpretation of a security deposit provision. Yet the appeal essentially comes down to what defendant Theodore M. Mountzuris (“Mountzuris”), a sophisticated businessman, was thinldng in the few minutes he took on March 7, 2000 to sign his name twice on a lease with plaintiff Cummings Properties, LLC (“Cummings”) before rushing off to catch a flight. The trial judge found that even though Mountzuris had the opportunity to read the lease and its guaranty provision, and signed the lease without indicating that he was acting in a representative capacity, he was not personally bound as a guarantor. As improbable as that might sound at first blush, we conclude that the evidence warranted that finding.
In the late 1990’s, Mountzuris formed, and held a fifty (50%) percent ownership interest in, a company named Restaurant Consulting Services, Inc. (“RCS”). In August, 1999, RCS became a subsidiary of Aspeon, Inc. (“Aspeon”), a publicly held corporation. Mountzuris stayed on as President and Chief Executive Officer of RCS, and reported to the CEO of Aspeon. During this period, Aspeon was also in the process of creating a new subsidiary called Aspeon Solutions, Inc. It was initially contemplated that Mountzuris would become an officer in Aspeon Solutions. As part of his duties, Mountzuris became involved in the search for office space to be used by Aspeon Solutions and in subsequent negotiations for a lease for such space in a building owned by Cummings. As these negotiations proceeded, Mountzuris became disenchanted with both Aspeon’s new management group and the business decisions they were making. He made it known that he was considering leaving the company. However, he continued to handle some matters, including the proposed lease with Cummings which was executed in March, 2000. Mountzuris left the company three months later.
The trial judge credited the following testimony of Mountzuris concerning the events surrounding the signing of the lease: On the morning of March 7,2000, the leasing officer for Cummings appeared at Mountzuris’ office and requested his signature on the lease. Since he had not been involved in the most recent negotiations for the lease, Mountzuris questioned why he should be the one signing it. *51 After being assured by his assistant that he was being asked by Cummings to execute the lease, Mountzuris met with the Cummings leasing officer. He asked the leasing officer if the documents had been “reviewed by Aspeon legal and negotiated by Aspeon, Inc.,” and if “these were the final terms.” The Cummings officer answered yes. Relying on that representation, and without reading the lease, Mountzuris signed it in two places that were checked, as described below. Before this appearance by the Cummings officer, no one from Aspeon Solutions or Cummings, the parties to the lease, ever discussed with Mountzuris that Cummings was seeking a guarantor, personal or otherwise, on the lease.
The actual document presented to Mountzuris on March 7, 2000 was comprised of four pages, plus a rider. There was a section on the signature page marked “LESSEE” next to which was typed “ASPEON SOLUTIONS, INC.,” and below which was a line which was checked and began with the printed word “By.” Mountzuris signed that line. His name was typed in below his signature at some later date. On the bottom of the page was a section clearly designated as a “GUARANTY.” Below the text of the guaranty was a signature line, with a check mark but without the words “By” or “Duly authorized,” which Mountzuris also signed. His name was, again, later typed in below his signature.
At trial, Mountzuris testified that he had no intention of signing a personal guaranty. He stated:
I would never sign a personal guarantee that I had no personal gains for. I had nothing to do with the company. It was no longer my company. I was not a principal] of the company, a stakeholder of the company, and I was leaving the company. I was very dissatisfied with what was going on on the management level and I had come to an agreement with [the CEO of Aspeon], a verbal agreement, that if things were going to continue in this direction I was going to leave.
After signing the lease, Mountzuris rushed off to catch his flight, and Cummings’ leasing officer returned to his office. No one signed the lease on behalf of Cummings until an agreement was reached with Aspeon on the “buildout” of the premises. Cummings and Aspeon finally agreed on March 27, 2000, and the lease was signed by Cummings’ Executive Vice-President on March 31, 2000. Mountzuris played no role in any of the events that took place between March 7 and March 31, 2000.
Other evidence supported the trial judge’s finding that Mountzuris did not sign the guaranty in a personal capacity. According to its general manager, Cummings did not always require personal guaranties on its leases. In fact, when the successor lessee to Aspeon Solutions objected to the inclusion of a personal guaranty, a compromise was reached whereby the security deposit was increased in lieu of a guaranty. Cummings’ manager also testified that “[gjenerally, the person who signs a personal guaranty presents themselves as a principal of the corporation that is the lessee, and you know, we look at that as a - - as much a statement of good will as financial depth”; that such person would generally have a stake in the corporation; and that he was not aware that Mountzuris ever came forward and presented himself as such a stakeholder, or ever indicated a willingness to sign a personal guaranty. Moreover, Aspeon’s Chief Financial Officer testified that when he raised the issue of a guaranty with Cummings’ leasing officer, he told the officer that any guaranty should be by Aspeon, Inc. Cummings sought at trial to characterize this statement as an “off the cuff’ remark. However, even if off the cuff, the trial judge found that it was made.
On appellate review, we must “accept the trial judge’s findings of fact as true unless they are clearly erroneous.” Williams v. Resolution GGF Oy, 417 Mass. 377, 381 (1994). It is Cummings’ “burden on appeal... to demonstrate that [the judge’s *52 findings were] not supported by ‘any reasonable view of the evidence, including all rational inferences’” of which they are susceptible. Diamond Crystal Brands, Inc. v. Backleaf LLC, 60 Mass. App. Ct. 502, 508 (2004), quoting Kitner v. CTW Transp., Inc., 53 Mass. App. Ct. 741, 748 (2002). “So long as the judge’s account is plausible in light of the entire record, an appellate court should decline to reverse it.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 510 (1997). We remain mindful, however, that this “clearly erroneous” standard “does not protect findings of fact or conclusions based on incorrect legal standards.” Williams, supra at 382. In the case at bar, we conclude that the trial judge’s findings were based on a reasonable view of the evidence and entirely plausible, and that his conclusions were founded on correct legal principles.
The legal standard involved here is the doctrine of fraud in the factum.
The defense of fraud in the factum presents in theory a somewhat confused intermingling of tort and contract principles. At the heart of the assertion of non est factum is the absence of that degree of mutual assent prerequisite to formation of a binding contract; absent the proverbial ‘meeting of the minds’ one cannot be said to have obligated himself in law and the purported transaction is regarded as void. This is a basic contract doctrine.... Thus, where the signer of the instrument has been led to believe and does believe that he is signing something of a different character from the note he actually does inscribe the signer has not in fact assented to the obligation represented by the paper.
26 S. Williston, Contracts §69.4, at 502 (4th ed. 2003), quoting Bancredit v. Bethea, 172 A.2d 10, 12 (N.J. Super. Ct. App. Div.). See also RESTATEMENT (SECOND) OF Contracts §163. In Massachusetts, this defense is codified in G.L.c. 106, §3-305(a) (1) (iii), which states that “the right to enforce the obligation of a party... is subject to ... fraud that'induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms.” The comment to subsection (a) (1) (iii) further provides:
In determining what is a reasonable opportunity all relevant factors are to be taken into account, including the intelligence, education, business experience, and ability to read or understand English of the signer. Also relevant is the nature of the representations that were made, whether the signer had good reason to rely on the representations or to have confidence in the person maldng them, the presence or absence of any third person who might read or explain the instrument to the signer, or any other possibility of obtaining independent information, and the apparent necessity, or lack of it, for acting without delay.
In Federico v. Brockton Credit Union, 39 Mass. App. Ct. 57 (1995), the Appeals Court concluded that the defense had not been proved because the
misrepresentation must go to the essence of the transaction. Fraud in the factum does not occur: when the essential nature of the document — here that it was a promissory note — has been accurately represented or is understood by the signer; when the signer is capable of reading and understanding the content of the document; and when the element represented does not involve the true nature or contents of the instrument, but concerns a term or factor in the transaction, even an important one, but not going to the essence.
Id. at 63. The Court concluded in Federico that the borrowers were in no doubt about the essential nature of the document. Rather, they were allegedly misled *53 only about “how the interest adjuster in the superseding note would operate in dollar terms.” Id. at 64. Compare, however, Jack Parker Indus. v. Federal Dep. Ins. Corp., 769 S.W.2d 700, 703 (Tex. App. 1989), where the court concluded that a defendant’s “summary judgment proof raised a genuine issue as to his defense of ... fraud in the factum.” In that case, the defendant admitted to signing the document in question, but “denied having been cognizant of signing a personal guaranty” and maintained, instead, that he received assurances that he was signing only in his representative capacity as president of Jack Parker Industries.
Based on the legal standard set forth above, we conclude that the trial judge’s finding in this case was founded upon a reasonable view of the evidence and clearly plausible. While, as the judge noted, there was no issue here about Mountzuris’ intelligence or command of the English language, Mountzuris had good reason to believe from the whole course of the negotiations that he was not signing a guaranty in his personal capacity. He was parting company with Aspeon. No one in his position would have put hundreds of thousands of dollars of his own money on the line for a company in which he had no stake and which he felt was heading in the wrong business direction. Moreover, nothing in the lease negotiations or in his dealings with Cummings gave him any reason to believe that his personal guaranty was being sought. When the subject of a guaranty had earlier been discussed, the Chief Financial Officer of Aspeon told the Cummings’ representative that if there was to be a guarantor for an Aspeon Solutions lease, it would be Aspeon, Inc. Mountzuris was authorized to sign on behalf of both Aspeon and Aspeon Solutions. On the day Mountzuris signed the lease, Cummings’ leasing officer assured him that the lease had been approved by counsel for “the Aspeon group,” thereby giving him the impression that both Aspeon entities were involved. A careful reading of the lease would not have alerted Mountzuris that he was giving a personal guaranty. Names were not printed on the forms. The trial judge could well have concluded that Mountzuris assumed that Cummings would later type in the entity on behalf of which Mountzuris was signing. Thus, unlike the situation in Federico, the very essence of the agreement was in issue as opposed to merely one of its terms. As to the essence or nature of the agreement, the judge could have found that there was no meeting of the minds. To be sure, it would have behooved Mountzuris to take the extra step required to indicate explicitly the capacity in which he was signing. But while he may have been hasty and a bit cavalier in failing to do so, he was not negligent in view of all the circumstances of this transaction. Even though this was a five-year lease with monthly rent in excess of $20,000.00, the tenor of the whole transaction was surprisingly casual and informal. The signatories did not even meet for the execution of the lease. On March 7, 2000, Cummings’ leasing officer arrived unexpectedly at Mountzuris’ office, caught him as he was proceeding out the door and presented him with a lease with blank signature lines. As noted, the final details of the lease were not worked out for an additional twenty-four days, and Cummings did not sign the lease until after that time.
In the circumstances of this case, we need not address the other issues raised on appeal. The judgment of the trial court for the defendant based on the defense of fraud in the factum is affirmed. Appeal dismissed.
So ordered.