Brant, J.
Leasecomm Corporation brought this action to recover the unpaid balance on a finance lease agreement owed by defendant Idorenyin Eme Akpaffiong (“Akpaffiong”). After a jury-waived trial, judgment was entered for Akpaffiong on both her counterclaims and on Leasecomm’s complaint. Leasecomm appealed. We reverse the trial court’s judgment.
Akpaffiong is a resident of Redondo Beach, California. She holds a bachelor’s degree from California State University, Los Angeles, and a master’s degree in accounting from the University of Southern California. She is a native of Nigeria. From 1996 to 1998, she worked as an accountant for the large accounting firm then known as Coopers & Lybrand. She later worked as an accountant for Vivendi International.
In 1998, Akpaffiong started a business to sell soap and other skin care products imported from Africa. Operating under the name Sahara Sunrise, Akpaffiong sold the products at various festivals, fairs, and shows. Akpaffiong soon realized that she needed to be able to accept credit card payments from her customers. She telephoned Cardservice International in response to its advertisement of a portable credit card reading machine. On February 2,1999, Cardservice International sent its employee, Shirel Golan (“Golan”), to meet with Akpaffiong at her home.
Golan and Akpaffiong met for approximately three hours. After learning about Sahara Sunrise, Golan recommended a machine known as the Tranz 420 as suitable for Akpaffiong’s business requirements. Golan explained in detail how the machine operated and gave Akpaffiong a product brochure. Akpaffiong first expressed interest in purchasing the Tranz 420, but decided to lease the machine. Golan presented Akpaffiong with a lease agreement and proposed a 48-month lease at $50.00 per month. When Akpaffiong expressed concern about the length of the lease, Golan offered a 24-month lease at $100.00 per month. Akpaffiong also questioned the price of the machine. Golan told her that she was getting the best price available. Later, after the lease agreement had been signed, Akpaffiong saw the machine advertised on the Internet for about $900.00.
When Akpaffiong asked what would happen at the end of the lease, Golan told her that she could purchase the machine for a small additional payment. The proposed lease agreement clearly stated that it was between Leasecomm and Akpaffiong. It provided that Akpaffiong would pay $100.00, plus applicable taxes *166 and fees, to Leasecomm each month for 24 months by a direct withdrawal from her checking account. The lease stated that at the end of the lease period, Akpaffiong could return the machine, purchase the machine for its residual value, or continue the payments at the same level on a month-to-month basis. The lease further stated, in italics, that unless Akpaffiong informed Leasecomm of her intentions 60 days before the expiration of the lease, she would be deemed to be extending the lease.
The lease also contained a provision in bold print and capital letters that “[n] either supplier nor any salesperson is an agent of lessor nor are they authorized to waive or alter the terms of this lease. Their representations shall in no way affect lessee or lessor’s rights and obligations as herein set forth.”
On February 2, 1999, Akpaffiong signed the application and the lease agreement, which included a personal guaranty of the contract, without ever reading the documents. Golan signed the lease agreement in the space marked “vendor’s salesperson.” A representative of Cardservice International signed the agreement in a box marked “vendor’s bill of sale” that stated that the equipment was being sold to Leasecomm. Akpaffiong also signed a merchant application and agreement on Cardservice International letterhead in which she provided bank and other information about her company. She also signed a “Lease Confirmation Form” from Leasecomm in which she acknowledged receipt of information about the terms of the lease. Cardservice International submitted the application and the lease to Leasecomm for approval. After conducting a credit check on Akpaffiong, Leasecomm accepted and signed the lease on February 17,1999. An employee of Leasecomm contacted Akpaffiong to confirm that she had received the credit card machine. Leasecomm then paid Cardservice International $1,868.50 for the machine and became its owner. Leasecomm sent Akpaffiong a letter confirming the terms of the lease agreement on February 23,1999.
For the 24 months of the lease term, Akpaffiong used the credit card machine and paid the monthly charges by prearranged bank drafts. However, at the end of the lease term, she did not purchase the machine, return it, or give any notice to Leasecomm of her intentions. Therefore, pursuant to its terms, the lease was automatically converted into a month-to-month rental, and monthly payments continued to be deducted from Akpaffiong’s checking account. Two months passed before Akpaffiong noticed that she was still paying for the credit card machine. She contacted Leasecomm, which responded by a letter on June 7, 2001, explaining Akpaffiong’s options. The letter listed a basic buyout price for the machine of $265.00, and a total buyout price of $399.11 that included a one-month rental payment arrearage. Leasecomm also began sending monthly invoices to Akpaffiong in lieu of deductions from her bank account.
Akpaffiong did not pay either buyout price, nor did she return the credit card machine. Instead, she simply continued to use the machine without paying for it for an additional 33 months until the machine broke down in January, 2004. During that period, Leasecomm sent numerous letters to Akpaffiong requesting payment of her increasing arrearage, and advised Akpaffiong that it would notify credit bureaus if she continued to refuse to make payment. Leasecomm ultimately transmitted negative financial information about Akpaffiong to various credit bureaus. She, in turn, simply complained to those bureaus, which restored her credit rating.
Much of what Akpaffiong argued in this case is based on Leasecomm’s consumer practice history. Leasecomm is currently headquartered in Woburn, but was located in Waltham at the time Akpaffiong executed her lease. Leasecomm is a wholly owned subsidiary of Microfinancial, Inc., a public company. During the 17 years between 1986 and 2003, Leasecomm executed at least 400,000 small-equipment finance leases similar to the one involved here. Typically, as was done here, *167 a representative of an equipment seller such as Cardservice International would deal directly with the business owner for the selection of the equipment and the negotiations for a lease of the same. The finance lease would then be executed by the business owner and Leasecomm.
Leasecomm’s standard lease provided that the equipment seller was solely responsible for any problems with the condition and operation of the equipment, and that the lease was a “non cancellable equipment lease agreement.” The standard finance lease also stated that it was to be construed according to the laws of the Commonwealth of Massachusetts, and contained a forum selection clause providing that any lawsuit for collection would be brought in a district court in Middlesex County, Massachusetts. Between 12% and 15% of the equipment finance leases signed by Leasecomm between 1986 and 2003 ended in default. Leasecomm filed more than 92,000 collection cases, mostly in the district courts in or near Waltham. Because the small business owners who had signed the leases were usually located outside of Massachusetts, a high percentage of the lawsuits resulted in default judgments.
In 2002, the Federal Trade Commission and the Attorneys General of Massachusetts and various other states began to investigate Leasecomm’s business practices. In 2003, Leasecomm and the Attorney General of Massachusetts entered into a consent judgment, which was filed in the Suffolk Superior Court. Their agreement states that “this Final Judgment is not intended, and shall not be construed, as an admission of wrongdoing.” Leasecomm agreed that its finance leases would not longer be non cancellable, and that it would institute its collection suits where the lessee resided or did business.
In October, 2002, Leasecomm filed this suit against Akpaffiong in the Salem District Court for breach of contract and breach of the personal guaranty she signed, alleging that it was owed $3,029.35. Akpaffiong retained counsel, answered the complaint and counterclaimed for Leasecomm’s alleged violations of G.L.c. 93A, defamation, unjust enrichment, and negligence. The negligence count was dismissed by agreement.
Akpaffiong testified that she experienced sleeplessness and stress from receipt of the collection letters and the filing of the lawsuit. She sought various medical treatments. She also incurred travel expenses in coming to Massachusetts during the pendency of the lawsuit for various legal proceedings. Eventually, the Sahara Sunrise business suffered, and she lost her $44,000.00-per-year accounting job with Vivendi International.
After the consent decree was filed, Leasecomm offered to have this case litigated in California, but Akpaffiong declined the offer and the parties stipulated to having the case tried in Salem.
After a four-day jury-waived trial, conducted on widely separated days over a one-year period between March, 2005, and March, 2006, the trial judge found for Akpaffiong on both Leasecomm’s complaint and her counterclaims on June 7, 2006. The judge concluded that the agreement between the parties was unconscionable at its inception in 1999, and that Golan had acted as leasecomm’s agent in misrepresenting the value of the credit card machine. The judge awarded Akpaffiong $49,963.37 in damages on her G.L. c. 93A counterclaim, which he then trebled to $149,890.11. The judge also awarded attorneys’ fees of $15,000.00 and nominal damages of $1.00 on the other two counterclaims. Leasecomm appealed.
The trial court’s finding that Golan was acting as Leasecomm’s agent was error. First, the lease agreement specifically provided that Golan was not Leasecomm’s agent. The lease was a valid arrangement between an equipment lessor and a product vendor. See Mayflower Seafoods, Inc. v. Integrity Credit Corp., 25 Mass. App. Ct. 453, 457-458 (1988). Second, there was nothing in Golan’s conduct that suggested that she might have been the agent for Leasecomm. Cortonis v. Medford *168 Hous. Auth., 343 Mass. 108, 113 (1961). The fraud of an agent acting in the course of his employment can bind the principal. Makino USA., Inc. v. Metlife Capital Credit Corp., 25 Mass. App. Ct. 302, 313 (1988). Akpaffiong’s proof of an agency relationship between Golan and Leasecomm, however, would have required some evidence that Leasecomm had control over Golan’s activities. Cowan v. Eastern Racing Ass’n, 330 Mass. 135, 141 (1953). As such evidence was entirely lacking here, there could be no finding of agency. Silvia v. Woodhouse, 356 Mass. 119, 124 (1969).
When Golan came to Akpaffiong’s house, she was attempting to sell a credit card machine for Cardservice International,' her employer. She could not have known that Akpaffiong would want to enter into a lease arrangement. When Akpaffiong expressed interest in an equipment lease, Golan presented her with a finance lease that clearly stated that it would be with Leasecomm. Golan did not sign the lease on behalf of Leasecomm; indeed, Leasecomm did not sign the lease for 17 days until after it had approved Akpaffiong’s credit. No agency was created between Golan and Leasecomm.
Further, Leasecomm did not set the price for the credit card machine. Even if Cardservice International was not selling the machine for the lowest price possible, Leasecomm would not have been responsible for any disparity between the market price and Cardservice International’s price. As we have said with regard to an identical Leasecomm lease:
When the commercial context has been, as here, a financing lease, the weight of authority is that the consideration which flows from the financing lessor is money, not a functioning product. Accordingly, a breach by the supplier of the equipment does not excuse the lessee from making lease payments to the finance lessor, unless the equipment lease otherwise provides. Where, as in many lease documents with a finance lessor (and in the instant case), there is an express disclaimer of liability for malfunctioning equipment, the position of the finance lessor is that much stronger.’ Leasecomm, therefore, is not subject to defenses arising out of misrepresentations by the supplier.
Leasecomm Corp. v. Crawford, 2003 Mass. App. Div. 58, 61, quoting Patriot Gen. Life Ins. Co. v. CFC Inv. Co., 11 Mass. App. Ct. 857, 862-863 (1981). A disclaimer of liability for the equipment is a standard term in an equipment lease. Patriot Gen. Life Ins. Co. v. CFC Inv. Co., supra at 861 n.5.
When Akpaffiong did not communicate with Leasecomm at the conclusion of the two-year lease period, the lease was automatically converted into a month-to-month lease. As noted, after Akpaffiong complained about the monthly deductions from her checking account, Leasecomm began billing her directly. Akpaffiong’s refusal to pay the invoices constituted a breach of the lease agreement. See Raymond Leasing Corp. v. Callico Distribs., Inc., 62 Mass. App. Ct. 747, 748-749 (2005). Thus, Leasecomm’s evidence was sufficient to require a finding as a matter of law that Akpaffiong’s failure to pay for the credit card machine that she continued to use for nearly three years amounted to a breach of both the parties’ lease agreement and the personal guaranty of that agreement that Akpaffiong signed.
The judge’s finding that the contract was unconscionable at the time it was signed was also unsupported by the evidence. The discussion of the equipment lease took place in Akpaffiong’s home. There is nothing in the record that suggests that there was any pressure on Akpaffiong to sign the equipment lease application on the day she met with Golan. Akpaffiong’s complaints obviously resulted from nothing more than her failure to read the documents before she signed them. Her neglect did not excuse her subsequent breach of contract. Akpaffiong is a highly educated person experienced in the business world. This was clearly a *169 commercial transaction between two business entities. The plain language of the lease agreement bound Akpaffiong. Miller v. Cotter, 448 Mass. 671, 678 (2007). At the end of the initial term of the lease, she had the opportunity to terminate the lease, or pay a buyout price. When she failed to do either, Leasecomm complied with the terms of the lease in converting it into a month-to-month rental. There is nothing hidden, or surprising, about the lease’s designation of the lessee’s options at the end of the lease term. The provision is highlighted on the lease, and it is worded simply and clearly.
Thus, Akpaffiong’s failure to read the documents and her resulting unfamiliarity with their terms did not absolve her of her contractual obligation to comply with those terms. “One who signs a writing that is designed to serve as a legal document is presumed to know its contents.” Hull v. Attleboro Sav. Bank, 33 Mass. App. Ct. 18, 24 (1992). In the absence of fraud, a person who signs a contract is bound by its terms. Freedley v. French, 154 Mass. 339, 342 (1891); Commerce Bank & Trust Co. v. Hayeck, 46
Mass. App. Ct. 687, 693 (1999). By signing the contract, Akpaffiong was put on notice of its contents. Ex parte Leasecomm Corp., 879 So. 2d 1156 (Ala. 2003). The extension of the lease on a month-to-month basis was solely attributable to Akpaffiong’s failure to take one of the steps clearly identified in the lease for termination of the agreement at the end of the two-year term. She could have easily determined how to terminate the lease simply by reading it. Leasecomm cannot be held liable for Akpaffiong’s refusal to read a legal document she had signed, or her decision to continue to use a credit card machine she did not own for almost three years without paying anything. The provision for an automatic continuation of the lease in the absence of any contrary notice from the lessee is a common term in an equipment lease, and is not unconscionable. See TAL Fin. Corp. v. CSC Consulting, Inc., 446 Mass. 422 (2006).
Similarly, the judge erred in finding that it was unconscionable for Leasecomm to require Akpaffiong to sign a personal guaranty of the lease. Personal guaranties are obviously very common in commercial transactions. In the absence of fraud, which is not even alleged here, such personal guaranties are generally enforced. Cummings Props., LLC v. Aspeon Solutions, Inc., 2007 Mass. App. Div. 50, 52-53.
Nor did the evidence support the judge’s determination that the lease was unconscionable because it was a printed contract drafted by Leasecomm. A contract of adhesion, like the one in this case, is “generally enforceable.” Chase Commercial Corp. v. Owen, 32 Mass. App. Ct. 248, 253 (1992). Contracts must be interpreted to “ascertain the intention of the parties and to effectuate the purpose sought to be accomplished.” Shea v. Bay State Gas. Co., 383 Mass. 218, 222 (1981). The parties’ intent in this case was clear from the lease, which simply provided a method for Akpaffiong to obtain a credit card machine by paying for it over time. There is nothing in the record to suggest that the terms of the parties’ contract were not clearly spelled out in both the lease itself and the explanatory documents Leasecomm sent to Akpaffiong. In short, Akpaffiong, not Leasecomm, was at fault here.
The trial judge’s erroneous determination that the lease was unconscionable was based primarily on the terms of the 2003 consent decree entered into between Leasecomm and the Attorney General of Massachusetts and filed in the Suffolk Superior Court. Leasecomm’s objection to the admission into evidence of the consent decree, a court document, was properly overruled. Leardi v. Brown, 394 Mass. 151, 166 (1985). A number of reported cases reference other consent decrees between Leasecomm and the Federal Trade Commission or various states. See, e.g., Leasecomm Corp. v. Long Island Cellular Ltd., 16 Misc. 3d 1 (2007); Leasecomm Corp. v. Moreno, 14 Misc. 3d 1237 (2007). A consent decree may enter after a finding of liability as a detailed plan for remedies. Perez v. Boston *170 Hous. Auth., 379 Mass. 703, 713-714 (1980); Johnson Turf & Gulf Mgmt., Inc. v. City of Beverly, 60 Mass. App. Ct. 386, 389 (2004). Consent decrees can also enter, however, without any admission or determination of liability. Commonwealth v. Philip Morris Inc., 448 Mass. 836, 837-838 (2007). The consent decree admitted into evidence in this case falls into the latter category as it specifically disclaimed any admission of wrongdoing by Leasecomm. In that circumstance, when there was no admission and no judicial determination of liability, the consent decree was merely a promise to change corporate practices. The decree cannot serve as a basis for a finding of the company’s wrongdoing. In short, the consent decree at issue in this case did not support the trial court’s findings in favor of Akpaffiong.
It should be noted that one of the major changes in business practices that Leasecomm agreed to in the consent decree was its abandonment of the forum selection clause that had permitted all of its collection cases to be brought in the district courts of Middlesex County, Massachusetts. No inference could be drawn from that portion of the consent decree to support Akpaffiong’s claim for damages. First, Leasecomm offered to have this case tried in California where Akpaffiong lived; she declined. More importantly, Massachusetts cases generally enforce forum selection clauses. Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics, 433 Mass. 122, 130 (2000). In fact, this Division has consistently upheld the validity of the forum selection clause long used by Leasecomm. See Leasecomm Corp. v. Crawford, 2003 Mass. App. Div. 58, 61; Leasecomm Corp. v. Crockett, 1998 Mass. App. Div. 6, 9-10; Leasecomm Corp. v. Collesano, 1994 Mass. App. Div. 126, 128.
Accordingly, as the trial court’s findings in favor of Akpaffiong on her counterclaims for breach of contract and unjust enrichment were unsupported by the evidence, they must be vacated.
Finally, the judge was in error in finding Leasecomm liable for defamation, a tort that requires the dissemination of false information. Ravnikar v. Bogojavlensky, 438 Mass. 627, 629 & n.3 (2003). Leasecomm’s reports to credit bureaus that Akpaffiong was in arrears on payments for the credit card machine were true. The dissemination of true information does not constitute defamation. Murphy v. Boston Herald, Inc., 449 Mass. 42, 50 (2007).
The judgment is reversed. A new judgment shall enter for Leasecomm on its complaint for breach of contract and breach of personal guaranty and on all the counterclaims. The case is returned to the Salem District Court for a hearing to assess damages in favor of Leasecomm.
So ordered.