In re MIRAJ AND SONS, INC., Debtor.

Bankruptcy No. 94–45220–HJB.

United States Bankruptcy Court,
D. Massachusetts.

Feb. 16, 1996.

Thomas N. O'Connor, Boston, MA, for debtor.

John A. Doonan, Salem, MA, for Cadle Company.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for determination is an objection filed by Miraj & Sons, Inc. (the "Debtor") to four (4) Proofs of Claim filed by The Cadle Company ("Cadle") totaling $2,198,869.70. The claims arise from moneys

borrowed by the Debtor in connection with the Debtor's purchase from the Bank for Savings of certain condominium units in Townsend, Massachusetts. The objection is framed in the context of the hearing on confirmation of the Debtor's Plan of Reorganization (the "Plan"). Feasibility of the Plan depends on a determination that the Cadle claim does not exceed the sum of $950,000.00. The following constitute findings of fact and conclusions of law, pursuant to Fed. R.Bank.P. 7052.

## I. *Facts*

In or about 1990, the Bank for Savings (the "Bank") was the owner of eighty-four condominium units located in the Pine Ridge Condominium in Townsend, Massachusetts (the "Units"). The Bank had acquired the Units after foreclosure of a mortgage with respect to an unrelated party. In its efforts to liquidate the Units, an agent for the Bank approached a certain Mirajuddin Ahmed ("Ahmed")[1] offering to sell to Ahmed certain of the Units for investment. Ahmed expressed interest in buying the Units from the Bank, having previously successfully consummated other real estate transactions of a similar type.

Ahmed's investment strategy was to form the Debtor to acquire the Units, with financing supplied by the Bank. He then planned to have the Debtor do minor repairs, rent the Units and eventually sell them to end users (preferably the tenants) in order to repay the Bank and earn a profit. The investment plan was obviously wholly dependent on the ability of end users to finance their acquisition of the Units from the Debtor. However, end user financing was problematic as only 2 out of the 120 units in the total project were then owner occupied. Under Fannie Mae guidelines, qualification for the financing of a condominium unit purchase then required that 70% of the total units be owner occupied. Absent the ability of end users to obtain financing, the Debtor would be forced to retain the Units as rental property. Such a

retention was not desired by the Debtor, nor was it financially feasible. With this problem in mind, Ahmed decided to offer to purchase certain Units from the Bank, *but only* if the Bank would agree to provide financing both to the Debtor to be formed *and* to the end users to whom the Debtor would market the Units.

On or about August 23, 1990, Ahmed offered to purchase seventy of the Units (the "First Offer") for the sum of $1,757,000, contingent on the Bank providing financing to the Debtor and end loan financing to the end users of those seventy units. The Bank and Ahmed engaged in extensive negotiations over the end loan financing. However, on September 6, 1990, the Bank finally accepted the Offer. The Bank then prepared a Commercial Loan Workout Request, dated October 11, 1990 (the "First Loan Request"), which provided in part: "The Bank will also provide the same financing rate to qualified borrowers who will be purchasing condos from the [Debtor]...."[2] The First Loan Request bears a stamp which reads "Voted by Board of Investment 10/12/90." The minutes of the October 12, 1990 meeting of the Bank's Board of Trustees reflect its approval of the loan, but do not specifically mention the end loan financing.

The Bank then prepared a commitment letter, dated October 24, 1990 (the "First Commitment Letter"), which provided that "the Bank shall provide financing to qualified buyers who are purchasing the condominium units ... from [the Debtor]." On November 15, 1990, Ahmed executed a Purchase and Sale Agreement for the seventy Units. The Purchase and Sale Agreement incorporated by reference the First Commitment Letter. The Bank executed the Purchase and Sale Agreement on November 26, 1990.

The closing of the sale of the seventy Units occurred on November 28, 1990, at which time the following relevant transactions occurred:

---

1. Mirajuddin Ahmed is president and a 50% shareholder of the Debtor. Habeebunnisa Ahmed, his wife, holds the remaining 50%. Mirajuddin Ahmed, and Habeebunnisa Ahmed are personally liable on the Notes.

2. The First Loan Request also included a request for a capital loan of $95,000 to refurbish the purchased Units.

(1) The First Commitment Letter was amended to add Miraj and Sons, Inc. (which had been incorporated five days earlier) as a party and set forth an amended loan repayment schedule. The First Commitment Letter, as amended, was initialled by all of the parties, including the Bank.

(2) A Commercial Loan Summary, prepared by the Bank, and dated November 28, 1990 (the "First Loan Summary"), was executed by the Debtor and witnessed by the Bank's counsel. The First Loan Summary specifically referred to the Bank's obligation to provide end loan financing.

(3) The Debtor executed and delivered to the Bank a variable rate promissory note, dated November 28, 1990 (the "First Note"), in the original principal amount of $1,581,300; as well as a mortgage, security agreement, and assignment of rents.

(4) The Debtor executed and delivered to the Bank an *additional* fixed rate promissory note, dated November 28, 1990 (the "Second Note"), in the original principal amount of $95,000 (as a working capital loan to refurbish the purchased Units); as well as a mortgage, security agreement, and assignment of rents.[3]

After the closing, the Bank's counsel prepared and tendered to the Bank for its records, a "loan bible," which contained among other things, the First Commitment Letter, the First Loan Summary, and the First Note.

In early 1991, the Debtor decided to purchase more Units from the Bank. Pursuant to an Offer to Purchase dated January 8, 1991 (the "Second Offer"), the Debtor offered to buy seven additional Units. The Second Offer provided for "closing terms to be the same as previous 70 unit transfer." The Bank's Loan Committee held meetings on April 5, 1991 and April 19, 1991 on the Second Offer. During these meetings, the Loan Committee voted to approve a $157,500 purchase money loan to the Debtor, but there was no specific mention of end loan financing. The minutes of the April 23, 1991

meeting of the Bank's Board of Trustees reflect its approval of the loan, but do not specifically mention end loan financing.

The Bank then prepared a Workout Loan Request, dated July 12, 1991 (the "Second Loan Request"), which provided in part "The Bank will also provide the same financing rate to qualified borrowers who will be purchasing said condos from the [Debtor]...."

The Bank prepared a commitment letter, dated July 16, 1991 (the "Second Commitment Letter"), which stated "the Bank shall provide financing to qualified buyers who are purchasing the condominium units ... from [the Debtor]...." The July 23, 1991 minutes of the Bank's Board of Trustees reflect its approval of the loan, but do not specifically mention end loan financing. On July 30, 1991, the Debtor executed a Purchase and Sale Agreement for the seven additional Units which incorporated by reference the terms of the Second Commitment letter.

The Second Loan Request was stamped with two stamps. One states: "Approved by Loan Committee 8/30/91;" the other states: "Voted by Board of Investment 9/10/91." The August 30, 1991 minutes of the Bank's Loan Committee reflect its approval of the loan, but do not specifically mention end loan financing. Likewise, the September 10, 1991 minutes of the Bank's Board of Trustees reflect approval of the loan, but do not specifically mention end loan financing.

The Bank then prepared another commitment letter, dated September 20, 1991 (the "Amended Second Commitment Letter"), which removed Khatija Gaffar (Ahmed's sister) as an obligor. The Amended Second Commitment Letter also expressly obligated the Bank to provide end loan financing. The Amended Second Commitment Letter was executed by the Debtor on September 27, 1991.

The closing of the sale of the additional seven Units occurred on October 2, 1991, at which time the following relevant transactions occurred:

---

**3.** For reasons not evident, but probably not relevant, the Bank only advanced $50,000.00 on the Second Note.

(1) A Commercial Loan Summary, prepared by the Bank, and dated October 2, 1991 (the "Second Loan Summary"), was executed by the Debtor and witnessed by the Bank's counsel. The Second Loan Summary specifically referred to the Bank's obligation to provide end loan financing.

(2) The Debtor executed and delivered to the Bank a variable rate promissory note, dated October 2, 1991, in the original principal amount of $157,000 (the "Third Note"); as well as a mortgage, security agreement, and assignment of rents.

After the closing, the Bank's counsel prepared and tendered to the Bank for its records, a "loan bible," which contained among other things, the Amended Second Commitment Letter, the Second Loan Summary, and the Third Note.

In late 1991, the Debtor decided to purchase even more Units from the Bank. Pursuant to an Offer to Purchase dated December 23, 1991 (the "Third Offer"), the Debtor offered to purchase seven more Units, again contingent on the Bank providing financing to the Debtor and end loan financing to the end users of the seven Units. The Bank prepared a Workout Loan Request dated February 5, 1992 (the "Third Loan Request"), which provided: "It should be noted that the Bank will also provide the same financing rate to qualified borrowers who will purchase the said condos from the [Debtor]...." The Third Loan Request was stamped with two stamps. One states: "Approved by Loan Committee 2/7/92;" the other states "Voted by Board of Investment 2/11/92." The minutes of the February 11, 1992 meeting of the Bank's Board of Trustees state: "Voted: to approve the [Miraj & Sons, Inc.] Commercial Loan request as presented," but do not specifically mention end loan financing.

The Bank then prepared a commitment letter dated February 11, 1992 (the "Third Commitment Letter"), which stated "The Bank shall provide financing to qualified buyers who are purchasing the condominium units ... from [the Debtor]...." A Purchase and Sale Agreement which incorporated by reference the Third Commitment Letter was executed by the Debtor and the Bank.

The closing of the sale of the seven Units occurred on February 28, 1992, at which time the following relevant transactions occurred:

(1) A Commercial Loan Summary, prepared by the Bank, and dated February 28, 1992 (the "Third Loan Summary") was executed by the Debtor and witnessed by the Bank's counsel. The Third Loan Summary specifically referred to the Bank's obligation to provide end loan financing.

(2) The Debtor executed and delivered to the Bank a variable rate promissory note, dated February 28, 1992, in the original principal amount of $127,800 (the "Fourth Note"); as well as a mortgage, security agreement, and assignment of rents.

After the closing, the Bank's counsel prepared and tendered to the Bank for its records, a "loan bible," which contained among other things, the Third Commitment Letter, the Third Loan Summary, and the Fourth Note.

On March 20, 1992, the Bank was declared insolvent and the Federal Deposit Insurance Corporation (the "FDIC") was appointed receiver. Notwithstanding that appointment, the Debtor remained current on its obligations to the Bank. Sometime after October 8, 1992, the Debtor commenced discussions with the FDIC, relative to repayment of the loans and the difficulties associated with obtaining a source for end loan financing.[4] On November 2, 1992, the Debtor wrote a letter to the FDIC acknowledging that the end loan financing promised by the Bank was no longer available and requesting the FDIC to reduce the principal amount of the loans as well as the interest rate.

On January 14, 1993, the FDIC responded to the Debtor's letter stating "we appreciate the fact that the value of your investments

---

**4.** The difficulties in obtaining financing for end users was not imagined. One proposed tenant/purchaser, Rosemary Whittier, testified and presented a financial picture that should have easily qualified her for financing. But she represented that of the twenty banks she contacted, only two would even accept her loan application. Ultimately, neither application was approved.

may have declined since you purchased the condominium units ... because we are not a lending institution and do not provide any banking services, I encourage you to actively seek refinancing of your loans elsewhere." The FDIC's response also suggested that the Debtor make an offer to compromise. On March 3, 1993, the Debtor met with an account officer of the FDIC who informed the Debtor that the FDIC would not provide end loan financing, and suggested again that the Debtor make an offer to compromise. At this time the Debtor stopped making payments on the Notes.

On June 29, 1994, the FDIC, as liquidating agent for the Bank, transferred the Notes and Mortgages to Cadle, without recourse, for the sum of $914,923.46.[5] By letter dated July 20, 1994, Cadle made demand for repayment of all amounts due under the Notes. The Debtor responded on July 28, 1994 by letter, setting forth its defenses against collection of the Notes.[6]

On August 12, 1994 Cadle filed suit against the Debtor in the United States District Court for the District of Massachusetts. The Debtor responded, on September 16, 1994, by moving both to dismiss the complaint and for summary judgment. The Motions were denied on December 1, 1994.

On August 19, 1994, the Debtor also filed a proof of claim with the FDIC for damages. The FDIC denied the Debtor's proof of claim on September 19, 1994, stating: "[t]he assets in question were transferred ... any liability and/or authority over this matter is transferred with the assets. Any questions should be referred to [Cadle]."

5. The Loan Purchase Agreement entered into by Cadle and the FDIC did not explicitly provide for the assumption, by Cadle, of the FDIC's liabilities.

6. Cadle was probably aware of the Debtor's defenses when it purchased the Notes. In a report sent by Daniel Cadle on July 1, 1994, only two days after Cadle purchased the Notes, an unknown author comments: "Dude wants to compromise debt at about $1,195,000 because he bought units from bank with understanding they would finance resale [ ...] then FDIC closed bank & no one will finance resale ... He needs some pressure."

Cadle noticed a foreclosure of the mortgages for November 29, 1994. On November 28, 1994, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this Court.

On or about December 15, 1994, Cadle filed with this Court four proofs of claim in the amounts of $1,812,400.82, $181,684.93, $147,081.66, $57,702.40. The Debtor timely objected to the proofs of claim, and the hearing on the objection was set in conjunction with the hearing on confirmation of the Debtor's Plan of Reorganization. At the trial on the objection, the Debtor introduced, inter alia, the testimony of an appraiser, Richard L. Keith. He testified as to the value of the eighty-four Units with and without end loan financing. Mr. Keith valued the eighty-four Units, as of February 1992, *with end loan financing* at $2,074,000, using an Investment Value Analysis; and, as of the same date, *without end loan financing,* at $905,000, using a Market Value Analysis; a difference of $1,169,000. Although Cadle cross-examined Mr. Keith, it did not call any expert witnesses at the trial to offer other values. Upon conclusion of the evidence on the objection to the claims, the Court took the objection under advisement and suspended the hearing on confirmation, pending resolution of the objection.[7]

II. *Positions of the Parties*

The Debtor objects to Cadle's proofs of claim on the basis that Cadle's predecessor in interest, the FDIC as receiver for the Bank, breached the end loan financing agreements thereby rendering the Notes and Mortgages null and void; or at a minimum entitling the

7. The parties have suggested, in a later hearing, that the Court also, expressly or impliedly, took under advisement in connection with the objections, a motion by Cadle for relief from the automatic stay, which motion had been previously continued from a prior hearing. The Court does not remember doing so. In any event, another motion for such relief was filed by Cadle thereafter, heard on February 6, 1996, and denied. Therefore, any previous such motion would now be moot.

Debtor to offset the damages caused by the breach against the amounts owed.

Cadle asserts that the end loan financing agreements are invalid and unenforceable under the estoppel doctrine announced in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and later codified at 12 U.S.C. § 1823(e). In the alternative, Cadle argues that the agreements were properly repudiated under 12 U.S.C. § 1821(e); that the Debtor waived its right to setoff by failing to follow the administrative claims procedure set forth in 12 U.S.C. § 1821(d); and that Cadle is not liable for any damages since it did not expressly assume the FDIC's liabilities.

### III. *Discussion*

#### A. **Holder in Due Course Status**

Cadle asserts that it is not subject to the Debtor's defenses to payment on the Notes because it is a holder in due course, and because the Loan Purchase Agreement between Cadle and the FDIC did not explicitly provide for the assumption of the FDIC's liabilities. Neither defense has merit.

The First, Third and Fourth Notes contained variable interest rates. Courts in this circuit have held that variable rate notes are non-negotiable instruments. *FDIC v. Rusconi,* 808 F.Supp. 30, 42 n. 23 (D.Me. 1992) (applying Massachusetts law); *Desmond v. FDIC,* 798 F.Supp. 829, 841 (D.Mass.1992); *New Connecticut Bank & Trust Co., N.A. v. Stadium Management Corp.,* 132 B.R. 205, 209 (D.Mass.1991). When notes are non-negotiable, the courts have declined to provide holder in due course protection to the FDIC or its assignees. *RTC v. Montross,* 944 F.2d 227, 228 (5th Cir.1991); *Desmond,* 798 F.Supp. at 841;

*Stadium Management Corp.,* 132 B.R. at 209 n. 8.[8]

Furthermore, Cadle cannot be a holder in due course as to any of the Notes because it purchased the Notes from the FDIC with notice that the Notes were overdue. Mass. Gen.Laws Ann. ch. 106, §§ 3–302(1)(c) & 3–304(3) (West 1990); 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 17–7 (4th ed. 1995). Cadle also cannot be a holder in due course under the shelter principle, because the FDIC was not itself a holder in due course. The First Circuit has held that the FDIC is not entitled to holder in due course status when it is acting in its receivership capacity. *604 Columbus Ave. Realty Trust,* 968 F.2d at 1352; *see Laguarta,* 939 F.2d at 1239 n. 19; *see also Desmond,* 798 F.Supp. at 841.

Finally, while it is true that Cadle did not agree to assume the FDIC's liabilities, Cadle did take the Notes subject to any defenses to collection. *See Parker North American Corp. v. RTC (In re Parker North American Corp.),* 24 F.3d 1145, 1155 (9th Cir.1994); *FSLIC v. Mackie,* 962 F.2d 1144, 1150 (5th Cir.1992). Even those cases which hold that the debtor may not bring counterclaims or claims for setoff against assignees, absent the assignee's assumption of liability, permit such claims as affirmative defenses to an action to enforce a note. *Mackie,* 962 F.2d at 1150; *Trigo v. FDIC,* 847 F.2d 1499, 1503 (11th Cir.1988); *see Desmond,* 798 F.Supp. at 841–42.

#### B. Application of the D'Oench Doctrine and 12 U.S.C. § 1823(e)

Cadle next argues that the Debtor's objection to claims based on breach of the end loan financing agreements must fail because of the estoppel doctrine announced in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S.

---

8. Cadle appears to confuse holder in due course status with the D'Oench doctrine and 12 U.S.C. § 1823(e). Although a number of courts imply that the D'Oench doctrine and § 1823(e) vest the FDIC with holder in due course status, *see e.g., FDIC v. Newhart,* 892 F.2d 47, 50 (8th Cir.1989); *FDIC v. Meyer,* 755 F.Supp. 10, 12 (D.D.C.1991), the First Circuit treats holder in due course status as affording protections different from the D'Oench doctrine. *Desmond,* 798 F.Supp. at 839; *see Capitol Bank & Trust Co. v. 604 Colum-* *bus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust),* 968 F.2d 1332, 1352 (1st Cir.1992); *Stadium Management Corp.,* 132 B.R. at 209; *see also FDIC v. Laguarta,* 939 F.2d 1231, 1239 n. 19 (5th Cir.1991). Whereas holder in due course status is available only to holders of negotiable instruments, the D'Oench doctrine is applicable to both negotiable and non-negotiable instruments. *FDIC v. P.L.M. Int'l, Inc.,* 834 F.2d 248, 255 (1st Cir.1987); *see RTC v. Kennelly,* 57 F.3d 819, 821–22 (9th Cir.1995).

447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and later codified at 12 U.S.C. § 1823(e).[9] The D'Oench doctrine prohibits borrowers from using secret or unrecorded side agreements to defend against efforts by the FDIC or its assignees to collect on promissory notes acquired from a failed bank.[10] *See Id.* at 460, 62 S.Ct. at 680–81. Under the D'Oench doctrine, no agreement which tends to diminish the FDIC's interest in any asset acquired as receiver of an insured depository institution is valid, unless the agreement (1) is in writing; (2) was executed by the debtor and the bank, contemporaneously with the acquisition of the asset by the bank; (3) was approved by the board of directors or its loan committee, as reflected in the minutes of the board or committee; and (4) has been preserved as an official record of the bank. 12 U.S.C. § 1823(e).

However, an exception to the D'Oench doctrine was recognized in *Howell v. Continental Credit Corp.* In that case, the Seventh Circuit held that the D'Oench doctrine is not applicable when the claims or defenses asserted by the debtor arise from bilateral obligations which are evident on the face of the document being enforced. 655 F.2d 743, 746 (7th Cir.1981). The court observed that when "the asset upon which the FDIC is attempting to recover is the very same agreement that the makers allege has been breached, § 1823(e) does not apply." *Id.* at 747. The First Circuit as well as the Fifth, Ninth, and Eleventh Circuits have adopted the *Howell* exception. *See e.g., Vasapolli v. Rostoff,* 39 F.3d 27, 33 (1st Cir.1994); *Laguarta,* 939 F.2d at 1239; *FSLIC v. Gemini Management,* 921 F.2d 241, 245 (9th Cir. 1990); *FSLIC v. Two Rivers Assoc., Inc.,* 880 F.2d 1267, 1275 (11th Cir.1989); *see also Levy v. FDIC,* 7 F.3d 1054, 1057–58 (1st Cir.1993); *FDIC v. Panelfab Puerto Rico, Inc.,* 739 F.2d 26, 30 (1st Cir.1984); *National Credit Union Admin. v. Ticor Title Ins. Co.,*

873 F.Supp. 718, 724 (D.Mass.1995); *FDIC v. Smith,* 848 F.Supp. 1053, 1057–58 (D.Mass. 1994).

Unfortunately for the Debtor, the *Howell* exception is inapplicable on these facts. The Debtor relies on the breach of the end loan financing agreements as a defense to payment of the Notes. However, as Cadle repeatedly points out, the end loan financing agreements are not contained in any of the Notes or Mortgages.

Still, all is not lost for the Debtor. The First Circuit has extended the application of the *Howell* exception to include agreements contained in closely related or integral loan documents which are in the bank's records. *Levy,* 7 F.3d at 1058; *Smith,* 848 F.Supp. at 1057; *see Vasapolli,* 39 F.3d at 33; *FDIC v. Bay St. Dev. Corp.,* 32 F.3d 636, 639 (1st Cir.1994). In *Smith,* Chief Judge Tauro found that the commitment letter was a closely related or integral document to the note. 848 F.Supp. at 1058. Thus he concluded that the D'Oench doctrine did not apply to the defendant's claim that the bank had violated a term of the commitment letter, even though the term was not present in the note. *Id.; but cf., Gemini Management,* 921 F.2d at 245 (D'Oench doctrine applied to agreement in commitment letter where letter was not evidenced by a promissory note, and expired on its own terms); *Fleet Bank of Maine v. Prawer,* 789 F.Supp. 451, 455–56 (D.Me.1992) (where notes were fully integrated documents, commitment letters that were inconsistent with terms of notes, and which were neither referenced nor incorporated into the notes were subject to D'Oench doctrine), *aff'd on other grounds,* No. 92–1740, 1993 WL 106823, at *3 (1st Cir.1993) (application of D'Oench doctrine not discussed).

■ In the instant case, the Court finds that, notwithstanding Cadle's protestations to

---

**9.** The D'Oench doctrine and § 1823(e) are hereinafter collectively referred to as "D'Oench doctrine." It is important to remember, however, that § 1823(e) is not necessarily coextensive with federal common law under D'Oench. *See Bateman v. FDIC,* 970 F.2d 924, 927 (1st Cir.1992).

**10.** As an assignee of the FDIC, Cadle would be entitled to the protection of the D'Oench doc-

trine, if applicable. *E.g., Porras v. Petroplex Sav. Ass'n,* 903 F.2d 379, 381 (5th Cir.1990); *Newhart,* 892 F.2d at 50; *National Enterprises, Inc. v. Smith,* 892 F.Supp. 948, 951 (E.D.Mich.1995); Mass.Gen.Laws Ann. ch. 106, § 3–201(1) (West 1990) ("transfer of an instrument vests in the transferee such rights as the transferor has therein").

the contrary, the commitment letters containing the end loan financing agreements for each of the Notes were closely related and integral loan documents to the Notes themselves. It is undisputed that end loan financing was a necessary precondition for the Debtor's entering into the loan arrangements with the Bank. The Bank found the First Commitment letter so critical as to have it amended even as late as the closing at which the First and Second Notes were executed.

Moreover, the Notes do not contain integration clauses stating that the Notes represent the entire agreement between the parties. In addition, all of the commitment letters and loan summaries, as well as every commercial loan request submitted to the Bank's Loan Committee and Board of Trustees for approval, expressly contained the end loan financing agreements. The First and Third Offers to Purchase explicitly state the Bank's obligation to provide end loan financing. The Second Offer to Purchase and all of the Purchase and Sale Agreements incorporate the end loan financing agreements by reference. Consequently, there were no offers, loan requests, commitment letters, purchase and sale agreements, or loan summaries which were silent as to the end loan financing requirement. Finally, the commitment letters and loan summaries were placed in loan bibles maintained in the Bank's files. Therefore, the Court finds that each and every one of these documents was closely related or integral to the respective loans, and as a result the D'Oench doctrine is inapplicable. *But see, Levy*, 7 F.3d at 1058 (purchase and sale agreement was not integral part of financing arrangements).

Even assuming, *arguendo*, that the D'Oench doctrine applies, the Court finds that all of its requirements are satisfied.

Section 1823(e) sets forth six distinct requirements that must be met in order for an agreement to be enforceable against the FDIC and its assignees.[11] The agreement must be (1) in writing; (2) executed by both the debtor and the bank; (3) executed contemporaneously with the making of the note; (4) approved by the bank's board of directors or its loan committee with (5) the approval reflected in the minutes of the board or committee; and (6) contained in the bank's records continuously. *RTC v. Midwest Federal Sav. Bank of Minot,* 36 F.3d 785, 795 (9th Cir.1994).

First, the Court must determine whether any of the documents containing the end loan financing agreements were executed by both the Bank and the Debtor contemporaneously with the Notes. There are three types of documents which must be considered with respect to the four Notes. The commercial loan requests, commitment letters, and loan summaries explicitly contain the end loan financing agreements and respectively reference the First, Third and Fourth Notes. And, the First Commitment Letter and First Loan Request each reference the Second Note.

 The commercial loan requests do not meet the D'Oench requirements since they were never executed by the Debtor. The loan summaries, however, are more problematic. With respect to the First, Third and Fourth Notes, the loan summaries were executed by the Debtor at the closing and thus were executed contemporaneously with the Notes. However, the only other execution of the loan summaries, prepared by the Bank, was by the Bank's attorney as witness to the Debtor's signature. The issue to be determined, therefore, is whether the Bank is deemed to have executed the loan summar-

---

11. Section 1823(e) provides:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
 (1) is in writing,
 (2) was executed by the depository institution and any person claiming an adverse

interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
 (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
 (4) has been, continuously, from the time of its execution, an official record of the depository institution.

ies. In *Twin Constr., Inc. v. Boca Raton, Inc.*, the Eleventh Circuit held that, in the context of § 1823(e)(2), the term "executed" means that the bank has signed the agreement. 925 F.2d 378, 384 (1991). The court stated that a piece of paper that merely recites the obligations of more than one party is insufficient to satisfy the execution requirement contained in § 1823(e). *Id.* The court based this conclusion on the policy that one of the purposes of the D'Oench doctrine is to assure prudent consideration of the loan by the bank before it is made. *Id.* (quoting *Langley v. FDIC*, 484 U.S. 86, 95, 108 S.Ct. 396, 403, 98 L.Ed.2d 340 (1987)). The court reasoned that if a bank has not signed a document that purports to impose on it certain obligations, there is no clear evidence that the bank considered the obligations. *Twin Constr.*, 925 F.2d at 384.

It is important to note, however, that in *Twin Constr.* the plaintiff was seeking to enforce a consent form that had been prepared by the plaintiff, not the bank. The situation presented here is quite different. The Bank, and not the Debtor, prepared the loan summaries, and the Bank's agent affixed his signature to the documents at the closings to witness the Debtor's signature. The Court finds that the policy of assuring prudent consideration of an agreement by a bank is sufficiently protected where, as here, the Bank's counsel prepares an agreement and witnesses the signatures of the borrowers. Thus, the Court finds that, with respect to the First, Third and Fourth Notes, the loan summaries which were prepared and witnessed by the Bank's counsel were executed by both the Bank and the Debtor contemporaneously with the Note.

■ In addition, the Court finds that the commitment letters also satisfy the execution requirements of § 1823(e) with respect to *all* of the Notes. There is no question that the commitment letters were executed by both the Bank and the Debtor. The issue, however, is whether that execution was contemporaneous with the Bank's acquisition of the Notes.

The First Commitment Letter was clearly executed by both parties contemporaneously with the Note. The First Commitment Let-

ter, referencing the First and Second Notes, was amended to add Miraj and Sons, Inc., which had been incorporated five days before the closing, as a party and set forth an amended loan repayment schedule. This Commitment Letter, as amended, was re-executed by the Debtor and the Bank at the closing.

The Amended Second Commitment Letter (referencing the Third Note) and the Third Commitment Letter (referencing the Fourth Note) were not re-executed at the closing. Nevertheless, the Ninth Circuit has held that a commitment letter executed between two and three months before the final loan documents, fulfilled the contemporaneous execution requirement. *Midwest Federal Sav. Bank of Minot*, 36 F.3d at 798; *contra RTC v. Dubois*, 771 F.Supp. 154, 156 (M.D.La. 1991) (commitment letter executed between three and eight months before notes was not contemporaneous); *Federico v. Brockton Credit Union*, 39 Mass.App.Ct. 57, 62–63, 653 N.E.2d 607, 610–11 (1995) (commitment letter not contemporaneous where note was executed 13 months after commitment letter). In *Midwest Federal Sav. Bank of Minot*, the court concluded that satisfaction of the contemporaneous requirement should be considered in light of commercial reality. 36 F.3d at 798. As a result, the court held that a commitment letter was contemporaneous with the preparation of the final loan documents in the sense that it takes several months to put together loans of this nature. *Id.*

■ In this case, the loan to which the Amended Second Commitment Letter related closed on October 2, 1991 (12 days after the date of the commitment letter). Likewise, the loan based on the Third Commitment Letter closed on February 28, 1992 (17 days after the date of the commitment letter). This Court agrees with the Ninth Circuit that the word "contemporaneous" should be construed in the light of commercial reality and consequently holds that, in this context, the time delays of 12 and 17 days do not render the commitment letters not contem-

poraneous.[12] Therefore, as explained more fully above, the Court finds that the loan summaries and commitment letters satisfy the execution requirements of § 1823(e).

The Court must next determine whether the end loan financing agreements were approved by the Bank's Board of Directors or its Loan Committee, and whether the approval was reflected in the Bank's minutes.[13]

The First Loan Request, referring to the loans now evidenced by the First and Second Notes, is stamped "Voted by Board of Investment 10/12/90." The October 12, 1990 minutes of the Board of Trustees reflect approval of the loans. The Second Loan Request is stamped "Approved by Loan Committee 8/30/91" and "Voted by Board of Investment 9/10/91." The minutes of the Loan Committee meeting on August 30, 1991 and the minutes of the Board of Trustees for September 10, 1991 reflect approval of the $157,500 loan. The Third Loan Request is stamped "Approved by Loan Committee 2/7/92" and "Voted by Board of Trustees 2/11/92." There are no minutes of the Loan Committee's meeting in the record, but the minutes of the February 11, 1992 meeting of the Board of Trustees state "Voted: to approve the [Miraj & Sons, Inc.] Commercial Loan request as presented."

■ Cadle argues that the term "voted" does not necessarily indicate the Board of Investment's approval, and that the approval indicated in all of the minutes does not specifically reference the end loan financing agreement. However, § 1823(e)(3) requires only that the agreements be approved by the board of directors *or* the loan committee. Thus, approval of the agreements by the Bank's Loan Committee, as is reflected on the Second and Third Loan Requests, is

sufficient. Additionally, even though all the Loan Requests are stamped "voted by the board of investment" as opposed to "approved;" all of the minutes of the Board of Trustees do indicate the loans were approved.

Furthermore, while it is true that the minutes do not specifically reflect approval of the end loan financing agreements, § 1823(e)(3) does not require that the Court blind itself to the same facts and issues that were before the Bank's Board of Trustees. There were never any Loan Requests before the Loan Committee or Board of Trustees that did not contain the end loan financing provisions; and the Commitment Letters, expressly containing the end loan financing agreements, were sent soon after the Board's approval.[14] These facts compel the Court to conclude that the Loan Committee and/or Board of Trustees approved the end loan financing agreements and that such approval was reflected in the Bank's minutes by reference.

■ Finally, the end loan financing agreements were maintained continuously as an official record of the Bank since each of the loan summaries and commitment letters were in loan bibles kept in the Bank's files.

In conclusion, the Court finds that both the Loan Summaries and Commitment Letters satisfy all the requirements of the D'Oench doctrine and, as a result, the agreements to provide end loan financing are enforceable against Cadle.

## C. Application of the FIRREA Administrative Claims Process

■ The Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") regulates the filing, determination,

---

12. Commitment letters have also been determined to be contemporaneous when copies of them are referred to in the later executed notes. *Erbafina v. FDIC*, 855 F.Supp. 9, 12 (D.Mass. 1994); *see Federico*, 39 Mass.App.Ct. at 62, 653 N.E.2d at 611. Each of the Notes in this case incorporate the commitment letters by reference for terms of default, and thus could be considered contemporaneous on this basis. *See* paragraphs 4 and 8 of each Note.

13. The Bank's so-called Board of Trustees was its Board of Directors.

14. The approval of the First Loan Request was reflected in the Board of Trustees' minutes for October 12, 1990; the First Commitment Letter was dated October 24, 1990. The approval of the Second Loan Request was reflected in the Board of Trustees' minutes for September 10, 1991; the Amended Second Commitment Letter was dated September 20, 1991. The approval of the Third Loan Request was reflected in the Board of Trustees' minutes for February 11, 1992; the Third Commitment Letter was also dated February 11, 1992.

and payment of claims against the assets of failed financial institutions after the FDIC has been appointed receiver. Under the administrative claims process ("claims process"), the FDIC is required to publish and mail a notice to any creditor shown on the institution's books and to provide at least ninety days for the filing of claims. 12 U.S.C. § 1821(d)(3)(B) & (C). After a claim is filed, the FDIC has 180 days to allow or disallow the claim. § 1821(d)(5)(A)(i). When a claim is disallowed, the claimant has 60 days to either request administrative review of the claim or file suit. § 1821(d)(6)(A). If the claimant fails to file a claim or to take action within 60 days of disallowance of the claim, the claimant loses all rights and remedies with respect to the claim. §§ 1821(d)(5)(C)(i) & 1821(d)(6)(B)(ii). Additionally, the courts have no jurisdiction over any claim that is made outside the claims process. § 1821(d)(13)(D).

In the present case, the bar date for filing claims was June 23, 1992. However, the end loan financing agreements were not breached by the Bank prior to its seizure. It was not clear that the FDIC would not honor the end loan financing agreements until March 3, 1993, when during a meeting with an account officer for the FDIC, the Debtor was told that the FDIC would not provide end loan financing and that the Debtor should make an offer of compromise. The Debtor filed a proof of claim with the FDIC on August 19, 1994, which was disallowed on September 19, 1994. After the claim was disallowed, the Debtor took no further action against the FDIC.

Cadle maintains that because the Debtor failed to pursue its claim against the FDIC within 60 days of disallowance, it waived its right to object to Cadle's claims on the basis of breach of the end loan financing agreements. In response, the Debtor argues that the claims process did not apply to claims based on the FDIC's repudiation of the contracts represented by the end loan financing agreements.

There is considerable disagreement among the courts regarding the application of the claims process to post-receivership contract repudiation. See e.g., Heno v. FDIC, 20 F.3d 1204 (1st Cir.1994) (FDIC's internal manual procedure applies to claims based on FDIC's repudiation of contracts); Homeland Stores, Inc. v. RTC, 17 F.3d 1269 (10th Cir.) (claims process does not apply to claims relating to the RTC's conduct as receiver), cert. denied, —— U.S. ——, 115 S.Ct. 317, 130 L.Ed.2d 279 (1994); Rosa v. RTC, 938 F.2d 383, 392–93 (3d. Cir.1991) (all claims for monetary relief arising out of the receiver's alleged breach of a contract are subject to claims process).

The complexity of this issue is exemplified by the First Circuit's decisions in Heno v. FDIC. 996 F.2d 429 (1st Cir.1993) (Heno I) withdrawn, 20 F.3d 1204 (1st Cir.1994) (Heno II). In Heno I, the First Circuit found that the claims process did not apply to claims based on the FDIC's disaffirmance of a contract after the bar date had passed. 996 F.2d at 434. However, in Heno II, it was brought to the court's attention that the FDIC had an internal manual procedure for handling claims based on its disaffirmance of contracts after the bar date. 20 F.3d at 1208. After noting that the FDIC failed to forewarn potential claimants of the existence of its internal manual procedure, the court deferred to the FDIC's authority to prescribe regulations regarding the allowance or disallowance of claims. Id. at 1208–09. Thus, in the First Circuit, the FDIC's internal manual procedure applies to claims based on the FDIC's repudiation of contracts.[15] Id.; Simon v. FDIC, 48 F.3d 53, 58 (1st Cir.1995); Forbes v. FDIC, 850 F.Supp. 94, 96 (D.Mass.1994); see also Prieto v. Standard Fed. Sav. Bank, 903 F.Supp. 670, 673 (S.D.N.Y.1995); FDIC v. Boyarsky, 1995 WL 373483, at *6 (S.D.N.Y.1995).

The FDIC's internal manual procedure, as set forth in the Appendix of Heno II, provides that the FDIC send a letter of disaffirmance to interested parties. 20 F.3d at

---

**15.** In support of its argument that the claims process is inapplicable, the Debtor relies primarily on FDIC v. Source One Mortgage Serv. Corp., 844 F.Supp. 40 (D.Mass.1994). See also Celtic

Dev. Corp. v. FDIC, 836 F.Supp. 926 (D.Mass. 1993). However, Source One is based on Heno I which, as explained above, was subsequently withdrawn.

1211. This letter also establishes a bar date of 90 days from the date of the letter or the postmark, whichever is later, for filing claims resulting from the disaffirmance. *Id.* In this case, the FDIC never complied with its own internal procedure. A letter disaffirming the end loan financing agreements was never sent to the Debtor, and in any event, notice of a bar date for any claim the Debtor might have based on such a disaffirmance was never sent or established.

In addition, on June 29, 1994, the FDIC sold the Notes and Mortgages to Cadle without recourse. Once the FDIC sold the Notes, the Notes were no longer an asset of the failed institution to which the claim process applied. In fact, in its letter of September 19, 1994 disallowing the Debtor's proof of claim, the FDIC stated "[t]he assets in question were transferred ... any liability and/or authority over this matter is transferred with the assets. Any questions should be referred to [Cadle]." Accordingly, the Court finds that the claims process is inapplicable on these facts.

Furthermore, at the time the Debtor's claim was disallowed by the FDIC, Cadle had instituted an action in the U.S. District Court against the Debtor to which the Debtor responded, on September 16, 1994, by moving both to dismiss the complaint and for summary judgment. To require the Debtor to bring an action against the FDIC upon disallowance of the claim, when the FDIC was no longer a party in interest, and the Debtor was already asserting its defenses against Cadle, would be absurd.

The Court also finds persuasive those cases holding that the claims process is inapplicable to claims against the FDIC that arise incidentally to the bankruptcy court's determination of the FDIC's claim against a debtor. *Parker North American Corp. v. RTC (In re Parker North American Corp.),* 24 F.3d 1145 (9th Cir.1994); *FDIC v. Continental Fin. Resources, Inc. (In re Continental Fin. Resources, Inc.),* 154 B.R. 385 (D.Mass.1993); *FDIC v. Purcell (In re Purcell,* 150 B.R. 111 (D.Vt.1993); *Scott v. RTC (In re Scott),* 157 B.R. 297 (1993), *withdrawn,*

162 B.R. 1004 (Bankr.W.D.Tex.1994)[16]; *All Season's Kitchen, Inc. v. FDIC (In re All Season's Kitchen, Inc.),* 145 B.R. 391 (Bankr. D.Vt.1992); *see In re Gemini Bay Corp.,* 145 B.R. 350 (Bankr.M.D.Fla.1992); *see also Midwest Fed. Sav. Bank of Minot,* 36 F.3d at 793 (claims process does not divest district court of jurisdiction where an affirmative defense is presented in response to an RTC claim); *contra, Wissel & Sons Constr. Co., Inc. v. Howard Sav. Bank (In re Wissel & Sons Constr. Co., Inc.),* 160 B.R. 48 (Bankr. D.N.J.1993); *Amsave Credit Corp. v. RTC (In the Matter of American Mortgage & Inv. Serv., Inc.),* 141 B.R. 578 (Bankr.D.N.J.1992).

These cases thoroughly examine the language of FIRREA and find that the claims process does not "discuss, mention or reference debtors, their responsibilities and duties, or the FDIC's treatment of debtors upon taking over as receiver of a failed bank." *Purcell,* 150 B.R. at 113; *see Parker,* 24 F.3d at 1152. For example, § 1821(d)(3)(B) requires that creditors be notified to present their claims through the claims process, yet there is no similar notice to debtors who might challenge the FDIC's claims against them. Likewise, § 1821(d)(10)(A) authorizes the FDIC to pay creditor claims which are allowed by the receiver. As observed in *Continental Fin. Resources,* "the fact that the statute does not even afford debtors adequate opportunity to avail themselves of the claims process reinforces the notion that the statute was never meant to apply to them." 154 B.R. at 388; *but cf. Freeman v. FDIC,* 56 F.3d 1394, 1401 (D.C.Cir.1995) (claims process is not limited to creditors, outside the bankruptcy context).

Similarly, in examining the legislative history of FIRREA, the court in *All Season's Kitchen* found "not a scintilla of a suggestion that Congress intended that debtors who owe money to the FDIC should have to go through the claims process, nor of any intent to deprive the bankruptcy court of jurisdiction to determine issues from FDIC's claims against those debtors." 145 B.R. at 397; *see Parker,* 24 F.3d at 1152; *Continental Fin. Resources,* 154 B.R. at 389.

**16.** Although Judge Clark withdrew the *Scott* opinion at the request of both parties as part of a

global settlement, the court's reasoning remains valid.

Therefore, the Court holds that the claims process does not apply to the Debtor's objection to Cadle's claims.[17] As a result, the Debtor's failure to pursue its claim within 60 days of the disallowance of its claim by the FDIC does not result in a waiver of its defenses to payment on the Notes.

### D. Application of the Repudiation Provisions of FIRREA

██ FIRREA grants the FDIC broad authority to disaffirm or repudiate contracts and leases entered into by failed institutions. 12 U.S.C. § 1821(e)(1).[18] The liability of the FDIC for disaffirmance of a contract is, with certain exceptions not applicable here, limited to actual direct compensatory damages determined as of the date the FDIC is appointed receiver. § 1821(e)(3)(A). The FDIC is not liable for punitive or exemplary damages, lost profits, or damages for pain and suffering. § 1821(e)(3)(B). Additionally, § 1821(e)(6) provides that where the FDIC repudiates a contract for the sale of real property, if the purchaser remains in possession of the property, the purchaser must continue to make all payments due under the contract and may offset against such payments any damages due to the repudiation.[19]

██ Neither party disputes that the FDIC repudiated the end loan financing agreements. Rather, the Debtor claims that since the end loan financing agreements were integrated into the Notes, the repudiation of the agreements rendered the Notes null and void. The Debtor relies on *Hackel v. FDIC*

for this proposition. 858 F.Supp. 289 (D.Mass.1994). In *Hackel,* the court held that where a lease was an integral part of a note, the FDIC's disaffirmance of the lease repudiated the entire agreement so that the note and all integral parts of the same agreement became null and void. *Id.* at 292. The *Hackel* court cited *Texas Commerce Bank Nat'l Ass'n v. Capital Bancshares, Inc.* as support; a case in which the Fifth Circuit stated that the FDIC's repudiation of a data processing agreement voided obligations under a note since they were part of an integrated agreement. 907 F.2d 1571, 1577 (1990).

However, both *Hackel* and *Capital Bancshares* are distinguishable on the basis that in both cases the notes contained specific provisions as to how defaults under the agreements were to be treated. In *Hackel* the note specifically provided that the debtor would not be in default of the note if the tenant defaulted on the lease. 858 F.Supp. at 292. Similarly in *Capital Bancshares,* the note incorporated a provision of a purchase and sale agreement which explicitly provided that the note would be void if the data processing agreement was terminated. 907 F.2d at 1573. These provisions reflected the parties' intent to avoid a windfall upon breach of the respective agreements. There are no such provisions in the Notes in this case, and the Court declines to interpret the repudiation provisions of FIRREA in such a way as to result in a significant windfall to the Debtor. The Court finds that the repudiation of the end loan financing agreements

---

17. The fact that the cited cases involved either preference or lien avoidance actions, whereas this case involves an objection to proofs of claim, is irrelevant. In the preference and lien avoidance actions, the debtor was seeking to limit its liability as a debtor; precisely Miraj's goal. *See Parker,* 24 F.3d at 1153.

18. Section 1821(e)(1) provides:

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
(A) to which such institution is a party;
(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

19. The Debtor argues that § 1821(e)(6) does not apply in this case. The Court agrees. The FDIC's repudiation was not relative to the sale of the Units. The sale was paid in full by delivery of the Notes. The FDIC only repudiated the end loan financing agreements.

In any event, any distinction between repudiation under § 1821(e)(1) and § 1821(e)(6) is not critical as under either provision the Debtor's damages are limited to actual direct compensatory damages arising from the disaffirmance. § 1821(e)(3)(B); § 1821(e)(6)(B)(II).

did not render the Notes null and void, and that FIRREA limits the Debtor's damages to actual direct compensatory damages.[20]

 Section 1821(e)(3)(A)(ii)(I) looks to the date the FDIC was appointed receiver to determine repudiation damages. The FDIC was appointed receiver of the Bank on March 20, 1992. The Debtor introduced into evidence an appraisal and expert testimony in support of its damage calculations. The Debtor's appraisal compares the Investment Value of the Units to their Market Value on various dates, including February, 1992.[21] Since this date is closest to the date of relevant inquiry, and Cadle provides no appraisal alternative, the Court adopts the February, 1992 measure as the most appropriate.

 Cadle argues that the Debtor's calculation of damages inappropriately includes a measure of lost profits. The Court disagrees. The Debtor is not seeking the profits lost as a result of being unable to sell the Units for quick resale. Rather, the Debtor is seeking to offset the difference between the value of the Units on quick resale (which would have been available with the benefit of end loan financing) against the value of the Units as rental units (necessitated by the absence of end loan financing). Such damages constitute actual direct compensatory damages. *See Nashville Lodging Co. v. RTC*, 59 F.3d 236, 245–46 (D.C.Cir.1995) (reliance damages are actual direct compensatory damages); *DPJ Co. Ltd. Partnership v. FDIC*, 30 F.3d 247, 249–250 (1st Cir.1994) (same).

Furthermore, Cadle offered no expert testimony to challenge the validity of the Debtor's appraisal or the qualifications of the Debtor's expert. Instead, Cadle contends that the Debtor actually suffered no damages as a result of the loss of end loan financing. That position stretches well accepted concepts of reality.[22] Cadle makes much of the fact that the Debtor subsequently purchased units from BayBank without end loan financing. Cadle compares the price of the Debtor paid for the BayBank units of $32.26 per square foot to the $32.29 per square foot the Debtor paid for the last seven Bank for Saving units to conclude that the lack of end loan financing caused no damages. However, Cadle offered no proof, by expert testimony or otherwise, that the BayBank units were similar or that the price paid per square foot is a reliable or an accepted method of valuation comparison.[23] As a result, the Court is left only with the Debtor's measure of damages.

 The Debtor's appraisal establishes that the value of the Units as of February 1992 with end loan financing was $2,074,000, while their value as of February 1992 without end loan financing was $905,000; a difference of $1,169,000. Therefore, the Debtor is entitled to setoff the sum of $1,169,000 in damages against Cadle's proofs of claim, plus the interest charged by Cadle on that difference from March 20, 1992 and included in its proofs of claim.

## IV. Conclusion

In view of the foregoing, the Debtor's objection to The Cadle Company's proofs of

---

**20.** Furthermore, neither *Hackel* nor *Capital Bancshares* contains any discussion of the limitation on repudiation damages contained in § 1821(e)(3); therefore, there is no evidence that the courts considered its application. In fact, *Capital Bancshares* contains no discussion of any of the repudiation provisions of FIRREA.

**21.** The Investment Value analysis reflects the value of the property to a particular investor based on his or her individual investment requirements including financing terms. The Market Value represents the most probable price a property should bring in a competitive and open market; no consideration is given to any benefit arising from financing nor does the Market Value appraisal reflect any specific investor's considerations in conjunction with the acquisition of the property.

**22.** It is indisputable that the Units are less valuable without end loan financing. Without financing, individuals buyers can only purchase the units if they are able to pay a significant portion of the purchase price in cash. Given this unlikely scenario, the Debtor is left holding the Units as rental properties.

**23.** Additionally, Ahmed testified that the Debtor purchased the BayBank units without end loan financing in order to gain a majority control of the condominium association, and to keep Baybank's foreclosure sales from depressing the market. This Court finds these reasons both logical and credible.

claim is sustained. The Debtor is entitled to setoff the sum of $1,169,000.00 in damages against Cadle's proofs of claim, plus the interest charged by Cadle on the difference from March 20, 1992 and included in its proofs of claim. A further hearing will be required to establish the amount of interest to be excluded, and to determine the impact of the reduced claim on confirmation of the Debtor's Second Amended Plan. A separate Order shall issue in conformity with this Memorandum.